J-S52021-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| BENJAMIN J. DENNERLEIN, | |
| Appellant | No. 2065 WDA 2014 |

Appeal from the PCRA Order of November 19, 2014
In the Court of Common Pleas of Beaver County
Criminal Division at No(s): CP-04-CR-0001592-2009

BEFORE:  SHOGAN, OLSON and WECHT, JJ.

MEMORANDUM BY OLSON, J.:                    **FILED NOVEMBER 16, 2015**

Appellant, Benjamin J. Dennerlein, appeals from the order entered on November 18, 2014, denying him relief under the Post-Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546.  We affirm.

The PCRA court provided us with a thorough and well-written summary of the underlying facts and procedural posture of this case.  As the PCRA court explained:

> On July 17, 2009, [Appellant] was charged with [murder].
> .  .  .    The charge[] stem[med] from an incident that occurred in Freedom Borough, Beaver County, Pennsylvania, in either the late evening hours of May 12 or early morning hours of May 13, 2009.  The victim, Elizabeth Grosskopf [(hereinafter "the Victim")], was found dead in her residence at 1475 Fifth Avenue, Freedom Borough, Beaver County, Pennsylvania.  An autopsy determined that [the Victim] died due to multiple stab wounds to the head and neck areas.  After an investigation by the Freedom Borough Police and the Beaver County Detectives' Bureau, [Appellant] was charged with homicide.

The case was scheduled for a jury trial before the Honorable John Dohanich. . . . [T]he jury convicted [Appellant] of [first-degree] murder on August 3, 2010. On September 29, 2010, Judge Dohanich sentenced [Appellant] to life imprisonment without [the possibility] of parole.

No post-sentence motions were filed, but a timely notice of appeal was filed with the Superior Court [] on October 27, 2010. [The Superior Court affirmed Appellant's judgment of sentence on April 2, 2012 and the Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal on October 22, 2012].

[Appellant] filed a timely *pro se* [PCRA] petition[] and [the PCRA court appointed counsel] to represent [Appellant] in the post-conviction proceeding[s]. [Appointed counsel] filed an amended [PCRA petition on Appellant's behalf and the PCRA] court conducted a hearing on the petition on August 4, 6[,] and 8[,] 2014. . . .

## FACTS

### A. Facts and Evidence Adduced and Presented at Trial in July and August[] 2010

. . .

[The following evidence was presented during Appellant's trial].

[The Victim], age 54, resided at 1475 Fifth Avenue, Freedom, Beaver County, in a residence owned by her and Robert Campbell, a former paramour, with whom she maintained a friendly relationship. [The Victim] was a frail woman in poor health, suffering from various medical conditions[,] which caused her to be unsteady and prone to falling on occasion. [The Victim] and Mr. Campbell purchased the residence in 2003, subject to a mortgage; however, the property was titled solely in [the Victim's] name because of Mr. Campbell's unstable financial condition. Subsequently, [the Victim] transferred the title by deed dated February 28, 2008, to herself and Mr.

Campbell, as joint tenants with the right of survivorship. . . .

[The Victim] and Mr. Campbell [] lived together for approximately ten years until May[] 2008, when Mr. Campbell left the residence to commence a live-in relationship with his current wife, Karen Otrhalik Babich. Mr. Campbell and Ms. Babich commenced their relationship in December[] 2007, which culminated in their marriage in October[] 2008.

Mr. Campbell's last contact with the [V]ictim occurred on May 8, 2009, when she telephoned to inform him that on May 7, 2009, she had received and deposited the sum of $31,128.14, representing her share of the proceeds from the sale of her parents' cottage in Erie. They discussed the uses to which she could put the funds. [The Victim] maintained a personal checking/credit/debit account with the Northern Lights branch of ESB Bank[,] which she opened [on] May 19, 1997. The account was limited to withdrawals of $510.00 per 24-hour period.

Mr. Campbell was introduced to [Appellant] approximately four years prior to the [V]ictim's death while both were inmates in the Beaver County [Jail] for reasons unrelated to the instant case. Upon release from incarceration, Mr. Campbell and [Appellant] maintained a friendly relationship, and [Appellant] resided with Mr. Campbell [and the Victim] from time to time when he was in need of a temporary residence. All three individuals were users of and smoked cocaine together on occasion. In December[] 2008, and continuing until the time of [the Victim's] death, [Appellant] resided at the [V]ictim's home, paying rent in the amount of $50.00 per week. [Appellant] was employed at Crow's Run Recycling as a salesperson from 2008 through May 13, 2009.

Prior to her death, [the Victim] was employed as a cashier at the Center Township Wal-Mart. [The Victim] last worked on May 11, 2009, from 11:00 [a.m.] until 8:00 [p.m.] and was observed at work by her neighbor, Dwight McMorris, while he was shopping at [the] Wal-Mart. Mr. McMorris subsequently observed the [V]ictim between 8:40 [p.m.] and 8:50 [p.m.] on the same day as she drove by his home

on the way to her residence after completing her work day. Mr. McMorris was the last person other than the perpetrator to see [the Victim] alive.

[The Victim] was scheduled to work on May 12, 2009, from 11:00 [a.m.] to 8:00 [p.m.]; however, she did not appear for work [or] call to indicate that she would not be present for work that day, which was unlike her because she was a reliable employee. Shortly before her death, [the Victim] reported to one of her co-workers, Nancy Pranskey, that [Appellant] had been stealing from her and using her credit/debit card to purchase items. Bank records disclosed that on May 5, 2009, [the Victim's] bank account had been overdrawn by $741.11 as a result of eight transactions.

[Appellant] also did not appear at his place of employment on May 12, 2009, and terminated his employment due to a disagreement with his employer, Nick D'Itri, by way of a text message on May 13, 2009, at 12:52 [p.m.] [Appellant] had been a good employee until approximately one month prior to terminating his employment when he began not reporting for work. The prior week he failed to appear for work on four consecutive days. His employer suspected that drug use was responsible for [Appellant's] decline in performance. [Appellant's] last working day was May 11, 2009.

Between 10:00 [a.m.] and 10:30 [a.m.] on May 12, 2009, Mr. Campbell sought [Appellant] at his place of employment. Not locating him at work, Mr. Campbell proceeded to the [V]ictim's residence and found [Appellant] present. Mr. Campbell noted that [Appellant] appeared to be under the influence of drugs. When Mr. Campbell inquired of [Appellant] as to the whereabouts of the [V]ictim, [Appellant] replied that he had taken her to work earlier that morning, because he was in need of her vehicle to run errands. Mr. Campbell, who maintained various items of personal property at the residence, searched the home to assure that his belongings were present and was followed through the house by [Appellant]. When looking into the [V]ictim's bedroom, Mr. Campbell observed that the bed had been made, which was unusual because the [V]ictim was a poor housekeeper and never made the bed. [Appellant] was directly behind Mr. Campbell as he was in

- 4 -

the doorway to the [V]ictim's bedroom. [Appellant] and Mr. Campbell became involved in a heated argument over [Appellant] not working to pay rent to the [V]ictim and his drug use. Mr. Campbell informed [Appellant] that he would return to the residence between 8:30 [p.m.] and 9:00 [p.m.], when the [V]ictim returned from work, to speak with [Appellant] and the [V]ictim.

Later in the same day at 3:25 [p.m.] [Appellant], using the [V]ictim's credit/debit card, made a balance inquiry at ESB Bank located at 921 Third Avenue in New Brighton. [Appellant], utilizing the [V]ictim's credit/debit card, purchased various items at the Chippewa Township K-Mart between 6:51 [p.m.] and 7:09 [p.m.] and proceeded to the home of Gregory "Wimpy" Price and Wendy McCoy to deliver items to Mr. Price, including video games, movies[,] and an electric can opener, to reimburse Mr. Price for tires that he purchased. . . .

[B]etween 8:30 [p.m.] and 9:00 [p.m.] on May 12, 2009, Mr. Campbell and his wife returned to the [V]ictim's residence and found no one present. The [V]ictim's vehicle was not in the area. Throughout the evening and into the early morning hours of May 13, 2009, Mr. Campbell attempted on 30 occasions to reach [Appellant] and on 17 occasions to contact the [V]ictim by telephone and through text messages[,] indicating his desire to speak to them. He received no responses, except that [Appellant] sent a text message advising that the Baden police would be interested in Mr. Campbell's use of marijuana. During the evening, Mr. Campbell and his wife left and returned to the [V]ictim's residence on two additional occasions and did not find anyone or the [V]ictim's automobile at the home. They left for the final time at approximately 12:00 [a.m.], returned to their residence[,] and retired for the night.

On May 13, 2009, at approximately 12:26 [a.m.], [Appellant] checked into Room 12 of the Beaver Falls Motel in Beaver Falls, following which he contacted Laura Rankin[ and] ask[ed] her to join him in smoking crack cocaine. Ms. Rankin telephoned Jennifer Burns, requesting that she provide transportation to the motel. Jennifer Burns and Bryan Silberger retrieved Ms. Rankin and her infant child and drove to the motel to meet [Appellant]. Ronald "Toot"

Goodman, the father of a child with Ms. Burns, and Patrick Brown, a supplier of crack cocaine for [Appellant], also appeared at the motel. Mr. Brown provided the cocaine to [Appellant]. [Appellant], when asked the reason for being in possessing of the [V]ictim's vehicle, informed Ms. Rankin that the [V]ictim was away on vacation visiting her niece in Maryland or Virginia. [Appellant] told Mr. Silberger that the [V]ictim was away in Maryland to visit her brother for a week. [Appellant], in an effort to assure Mr. Brown, his cocaine supplier, that he had sufficient funds when requesting Mr. Brown to provide an advance of drugs, had previously forwarded a text message to him on May 9, 2009, showing a balance in the [V]ictim's bank account of $29,712.14. [Appellant] and the other individuals smoked crack cocaine throughout the early morning hours of May 13, 20[09], until approximately 5:00 [a.m.] During that time, [Appellant] and Ms. Rankin left the motel and proceeded to two convenience stores to purchase items and attempted to obtain funds using the [V]ictim's credit/debit card. At one point in time, [Appellant] advised Ms. Rankin that he was using the [V]ictim's credit/debit card, showed her the balance in the account and stated to her, "stick with me and good things will happen[.")

Mr. Campbell, accompanied by two friends, Martin Costanza and Justin Hertnecky, proceeded to the [V]ictim's residence on May 13, 2009, between 8:30 [a.m.] and 9:00 [a.m.] No one was present and the [V]ictim's car was not at the residence. The three of them gathered [Appellant's] belongings, placed them in garbage bags[,] and stored the bags in the garage of the residence. Mr. Campbell opened the [V]ictim's bedroom door and found the bed in the same condition as the day before, as if it had not been disturbed. They then left the residence and returned to Mr. Campbell's house for the balance of the morning. Mr. Campbell's intention was to evict [Appellant].

After leaving the motel and driving his friends home, [Appellant] claimed to have returned to the [V]ictim's residence to locate her, found that she was not present, that her bed did not appear to have been slept in, and then proceeded to the Beaver Valley Mall. At 1:15 [p.m.] on May 13, 2009, [Appellant] presented a check made payable on the [V]ictim's account to himself in the amount of

$1,000.00 at the ESB Bank in Beaver Falls. The memo portion of the check indicated the words, "roof/porch[."] [Appellant] explained that he had performed work for the [V]ictim and the check represented payment. Ms. Celeste, the [V]ictim's [next-door] neighbor, indicated that no recent work had been done on the house. The bank representative requested identification from [Appellant], since he did not have an account with the bank, and he provided his driver's license. The check was drawn on the Northern Lights ESB Bank located in Baden. The Beaver Falls ESB Bank manager telephoned the Northern Lights branch and obtained a facsimile of the signature card of the [V]ictim. The Beaver Falls branch manager also placed two telephone calls to the [V]ictim's residence and the telephone was not answered on either occasion. After being unable to verify [Appellant's] correct address and telephone number or the [V]ictim's signature, the bank refused to cash the check and returned the check to [Appellant].

Trooper Robert Negherborn, a forensic document examiner with the Pennsylvania State Police Crime Laboratory, recovered from the face of the subsequent check in the [V]ictim's checkbook the impression of the writing depicting the text of the previous check payable to [Appellant], including the authorizing signature. [Trooper Negherborn] was further provided with handwriting samples of the [V]ictim and [Appellant]. Although not issuing a conclusive opinion, Trooper Negherborn testified that in comparing the writing on the check with the samples of the handwriting of the [V]ictim and [Appellant], there was a strong probability that the signature on the check was not that of the [V]ictim. He further opined that there were no significant similarities to indicate that the [V]ictim or [Appellant] wrote the entries on the check, or that [Appellant] wrote the signature on the check.

At approximately 2:00 [p.m.] on May 13, 2009, [Appellant] purchased tennis shoes at the Shoe Department Store at the Beaver Valley Mall using the [V]ictim's credit/debit card. A short time later[,] he attempted to return the tennis shoes for a cash refund without the credit/debit card and was refused. [Appellant] was accompanied by Ms. Rankin and met Mr. Price while at the Beaver Valley Mall and purchased other items with the [V]ictim's credit/debit card.

He also attempted to buy tennis shoes for Mr. Price using the [V]ictim's credit/debit card and was refused.

At approximately 1:00 [p.m.], Kelly Carter, who had previously made payment of $500.00 for the purchase of an automobile from [Appellant], telephoned [Appellant] informing him that he was at the residence desiring to retrieve the vehicle from the garage. [Appellant] advised Mr. Carter that he would not arrive for a period of time, and Mr. Carter waited. When [Appellant] failed to appear, Mr. Carter made a second telephone call, at which time [Appellant] instructed Mr. Carter to enter the home to obtain the remote control for the garage door. At the direction of [Appellant], Mr. Carter entered the house by way of a window and was unable to locate the remote control while continuing to speak to [Appellant] on the telephone. Mr. Carter then telephoned Mr. Campbell, who subsequently arrived and informed Mr. Carter that he was in possession of the remote control and would not permit the removal of the vehicle until [Appellant] appeared. Mr. Carter placed a third call to [Appellant], who indicated he would return later. Both Mr. Campbell and Mr. Carter observed what appeared to be blood on the [V]ictim's dog and entered the house to investigate. Mr. Campbell entered the [V]ictim's bedroom and discovered a pool of blood on the bed where the blanket had been pulled away. He called Mr. Carter into the bedroom to observe the blood. Mr. Carter then telephoned [Appellant], informed him of their findings[,] and inquired whether he knew the whereabouts of the [V]ictim, to which [Appellant] replied that he thought she was at work. Mr. Carter told [Appellant] he should return to the residence immediately. [Appellant] indicated that he was at the Beaver Valley Mall and would return home at a later time. He also stated that he had not been at the residence for several days. Mr. Campbell, after contacting the [V]ictim's employer and the hospital in an unsuccessful attempt to locate her, placed a call to [911] at 2:54 [p.m.] Freedom Borough Chief of Police John Hill and Officer William Dreyer of the Freedom Borough Police Department responded to the call at approximately 3:00 [p.m.] Andrew Gall of the Beaver County Detective Bureau received a call for assistance from the Freedom police officers at 3:10 [p.m.] and responded to the residence with

County Detectives Timothy Staub, Kim Clements, Timmie Patrick[,] and Robert Chamberlain.

A search of the residence disclosed the [V]ictim's body wrapped in blankets in a stairwell on the second floor leading to the attic, which was located between the bedrooms of the [V]ictim and [Appellant] and could be accessed from both bedrooms. The police found no evidence of forced entry into the home. When informed of [the Victim's] death, Mr. Campbell became extremely distraught. As a result of receiving information from Ms. Rankin's mother that Ms. Rankin was with [Appellant] in her vehicle at the Beaver Valley Mall, a BOLO (be on look out) alert was broadcast for [Appellant], the [V]ictim's vehicle[,] and the vehicle being operated by Ms. Rankin and owned by [Ms. Rankin's] mother. Ms. Rankin received telephone calls from a friend and her mother advising that the names of [Appellant] and Ms. Rankin were heard on the [police] scanner indicating that the police were attempting to locate [Appellant].

Detective Patrick proceeded to [Appellant's] place of employment and in speaking to Mr. D'Itri[,] found that [Appellant] last worked on May 12, 2009, and terminated his employment on May 13, 2009. Mr. D'Itri provided [Appellant's] cellular telephone number to Detective Patrick, who attempted several calls and text messages to [Appellant] with no response.

At 6:07 [p.m.], Officer Maxim Strano of the Center Township Police Department, in response to the alert, located [Appellant] and Ms. Rankin in the automobile being operated by Ms. Rankin as it was backing out of a parking space at the Beaver Valley Mall. [Appellant] stated to Ms. Rankin "to go or he was going to run[."] Officer Strano drew his weapon, ordered both individuals to the ground, approached [Appellant,] and placed [Appellant] in handcuffs. [Appellant] stated that he thought about running and should have run when he saw the officer. [Appellant] also indicated that Officer Strano had the wrong man. The [V]ictim's credit/debit card was found in [Appellant's] wallet. The [V]ictim's vehicle was also located a short distance away.

[Appellant] and Ms. Rankin were transported to the Center Township Police Department. At 6:39 [p.m.], [Appellant] waived his [*Miranda*] rights and agreed to speak with Detectives Patrick and Clements. [Appellant] was informed of [the Victim's] death and showed no emotion. He indicated that in the evening hours of May 11, 2009, he and his girlfriend, Colleen Cantella, were at the [V]ictim's residence viewing the Pittsburgh Penguins/Washington Capitals hockey game. [Appellant] further advised that the [V]ictim came home from work during the hockey game. According to [Appellant], Ms. Cantella departed after the hockey game to return to her residence. This information was contrary to the statement made by Ms. Cantella that she was not at the [V]ictim's residence on May 11th and that [she and Appellant] had exchanged text messages between 9:23 [p.m.] and 10:07 [p.m.] near the end of the hockey game, when she was at her own residence. . . .

[Appellant] stated that on May 12, 2009, he drove the [V]ictim to work at Wal-Mart at approximately 10:00 [a.m.], attended to several errands[,] and returned to the residence, when he made contact with Mr. Campbell and a verbal argument ensued. After the disagreement with Mr. Campbell, he advised that he left the residence, ran a few more errands[,] and went on a crack cocaine binge. He stated that he returned to Wal-Mart between 8:00 [p.m.] and 8:30 [p.m.] to pick up [the Victim], and when she did not come out to the vehicle, he went into the store and was told that she was not at work all day. He also advised the detectives that he tried to call [the Victim] and received no reply. The [V]ictim did not report to work on May 12, 2009, and video footage of the entrance and the customer service area of Wal-Mart disclosed that [Appellant] did not appear at the relevant time. . . .

[Appellant] obtained crack cocaine from Mr. Price and checked into the Beaver Falls Motel to smoke crack cocaine with Ms. Rankin and her friends. They all remained at the motel into the early morning hours of May 13, 2009. [Appellant] advised that he checked out of the Beaver Falls Motel at approximately 11:00 [a.m.] and returned to the residence to look for the [V]ictim. He found that her bed was made and did not appear to have been slept in. [Appellant] then proceeded to the Beaver Valley Mall where

he met Mr. Price and offered to purchase tennis shoes for him as payment for cocaine previously supplied by Mr. Price. [Appellant] attempted purchases at two separate retail locations using the [V]ictim's credit/debit card and was rejected. [Appellant] advised that he had the information regarding the [V]ictim's credit/debit card, including the [V]ictim's personal identification number (PIN) to access the account. [Appellant] related that he obtained the credit/debit card from the [V]ictim's purse located in the kitchen of the residence. The detectives were unable to locate the [V]ictim's purse in the kitchen of the home and subsequently found it in the [V]ictim's vehicle. Upon receiving this information, [Appellant] informed the detectives that he had taken the credit/debit card out of the [V]ictim's purse and placed the purse in the automobile. [Appellant] claimed to have permission from the [V]ictim to use the credit/debit card. . . .

Near the conclusion of the interview, which lasted approximately one hour, [Appellant] stated to the detectives that if they were going to arrest him for murder to do so. He further stated that "all I have to do is convince one person" that he did not commit the offense. The [V]ictim's purse, Wal-Mart identification card, driver's license, checkbook[,] and cellular telephones were all located in the [V]ictim's vehicle, which was in the possession of [Appellant].

Prosecutors acquired the [V]ictim's bank records for the period from May 1, 2009, through May 31, 2009, the telephone records of [Appellant] from May 8, 2009, through May 14, 2009, and located various receipts for purchases and automatic teller machine (ATM) withdrawals from the [V]ictim's account in the vehicles of the [V]ictim and Ms. Rankin and in the trash bin at the Beaver Falls Motel. . . .

In addition, Detective Chamberlain obtained documentation from Verizon Wireless depicting the sites of cellular telephone towers in Beaver County from which he was able to confirm the approximate location of [Appellant] when he was using his cellular telephone. This information, together with the known observations of [Appellant] from witnesses and the video displays of [Appellant] at bank ATM and retail locations, placed [Appellant] in the area of the [V]ictim's

residence during the hours when she would have been killed and at the various locations at which he made ATM withdrawals and purchases using the [V]ictim's credit/debit card.

An examination of [Appellant's] blue jeans and tennis shoes under a blue light revealed possible blood stains. Samples of the blood of the [V]ictim and [Appellant], together with [Appellant's] blue jeans, were delivered to the Pennsylvania State Police Crime Laboratory for analysis. Jennifer Badger, a forensic scientist in the serology section, determined that two stains on the outside seam of the lower leg of [Appellant's] blue jeans consisted of blood. She further detected the presence of blood on the eyelet of the toe of [Appellant's] left athletic shoe, but the sample was insufficient for a confirmatory testing for blood. In addition, examination of the handle of a steak knife found in the kitchen sink of the [V]ictim's residence submitted to the crime laboratory disclosed evidence of blood. Ms. Badger prepared samples of dried blood of the [V]ictim and [Appellant] and swabs of the blood on [Appellant's] jeans, tennis shoes[,] and the steak knife for submission to the DNA section of the crime laboratory. Michael Biondi, a forensic scientist supervisor in the DNA section, conducted DNA testing on the swabs of [Appellant's] blue jeans and determined that the blood on the jeans matched the [V]ictim's blood. The DNA profiles of the [V]ictim and [Appellant] could not be excluded as potential contributors of the blood stain from [Appellant's] shoe. The DNA profile of the [V]ictim was excluded as a contributor as to the knife in the kitchen sink, while the DNA profile of [Appellant] could not be excluded as a contributor for the blood on the knife, because there also appeared DNA types from two unidentified individuals.

Dr. James Smith, a forensic pathologist, determined that due to observing the greenish discoloration of the body, signifying the first sign of decomposition, the [V]ictim's death occurred within an 18-hour to 36-hour period between 3:00 [a.m.] and 9:00 [p.m.] on May 12, 2009. Dr. Smith opined that the cause of death was the stab wounds to the neck which incised the right carotid artery and the right jugular vein. He noted a total of 46 knife wounds, 34 of which were located in the left neck region. Dr. Smith

- 12 -

further described defensive wounds on the [V]ictim's hands and fingers indicating that the [V]ictim attempted to ward off her attacker. He testified that the concentration of the wounds in the neck area was an indication the [V]ictim was held down and was struck with such force as to penetrate from the left through the right side of the neck. Dr. Smith estimated that the blade of the knife was approximately one-half inch in width and three inches in length. The manner of death was homicide.

James Sarver met [Appellant] on May 15, 2009, while both were inmates in the Beaver County Jail. Mr. Sarver also was familiar with Mr. Campbell from whom he had purchased marijuana in the past. Mr. Sarver related that [Appellant] admitted to him that he had killed [the Victim] and intended to place blame on Mr. Campbell for the crime. In a second conversation with Mr. Sarver, [Appellant] queried as to why Mr. Campbell came to the [V]ictim's residence and removed the sheets on the bed revealing the pool of blood. [Appellant] informed Mr. Sarver of the limit of $500.00 on the [V]ictim's credit/debit card and confirmed that he went partying and shopping after the killing. Mr. Sarver testified that he had previously been a visitor at the [V]ictim's residence, [but was] limited [] to the main floor of the house.

Zack Valentine was [Appellant's] cellmate at the Beaver County Jail for approximately two weeks. On May 18, 2009, Mr. Valentine provided a statement to police in which he indicated that he had become acquainted with [Appellant] prior to their incarceration while working at Crow's Run Recycling. Mr. Valentine stated that [Appellant] acknowledged that he had killed the victim, wrapped her in a blue blanket and placed her body in the stairway to the attic between the two bedrooms in the [V]ictim's residence. [Appellant] also outlined [to Mr. Valentine] the layout of the house and provided a diagram detailing the location of the bedrooms and the doorways from each bedroom to the attic. [Appellant] further described [to Mr. Valentine] the placement of a tan blanket covering the blood on the bed and complained that Mr. Campbell had pulled the blanket away exposing the blood. Mr. Valentine, who had never been to the residence, drew a diagram of the residence for the police based upon [Appellant's] description. Mr.

- 13 -

Valentine had been unaware of the homicide until his conversation with [Appellant].

[Appellant] presented evidence in an effort to place culpability for the crime on Mr. Campbell by attempting to demonstrate that he had been physically abusive toward the [V]ictim and that he had a financial motive for killing her.

Mr. Campbell testified that the [V]ictim called him shortly after he had moved out of the house and into Ms. Babich's residence, indicating that she desired to title the home in both of their names. Ms. Babich, who was a mortgage processor and notary public, fabricated the transfer by having the deed prepared, notarizing [the Victim's] signature, recording the deed and paying the recording fee and transfer taxes, for which she was subsequently reimbursed.

Patricia Celeste, the [next-door] neighbor and friend of the [V]ictim, observed a black eye on the [V]ictim on one occasion and her leg to be injured at a subsequent meeting, both injuries which the [V]ictim attributed to [Appellant]. When Ms. Celeste confronted [Appellant] regarding the incidents, he apologized for his actions. He further explained that the black eye occurred when he became angry with the [V]ictim for refusing to eat dinner he had prepared and he had struck the [V]ictim with the food plate.
. . .

Stacie Delp, Kristine Ramer[,] and Nancy Pranskey, all co-workers of the [V]ictim, noted black eyes on the [V]ictim, with Ms. Delp also observing the injured leg. Only Ms. Pranskey testified that the [V]ictim told her that the injuries were inflicted by Mr. Campbell.

On the evening of May 9, 2009, while Mr. Campbell, his wife[,] and his friend, Martin Costanza, were patrons at Harvey Run Inn, a local tavern, Crystal Barnes, an employee, overheard Mr. Campbell, following a telephone conversation, say loudly to his wife, "cha-ching, cha-ching[."] Ms. Barnes admitted to being unaware of the meaning of Mr. Campbell's remarks. Approximately two to three months following the [V]ictim's death, Mr. Campbell was advised by correspondence from Wal-Mart, the

- 14 -

[V]ictim's employer, that he was the beneficiary of the [V]ictim's retirement account in the amount of $1,893.34 and life insurance benefits in the amount of $22,000.00. The [V]ictim had designated Mr. Campbell the beneficiary as her common-law husband on June 27, 2005, approximately four years prior to her death. Mr. Campbell denied any knowledge that he was the [V]ictim's beneficiary prior to receiving notice from her employer. He, in fact, received the proceeds from both the retirement account and the life insurance as a result of [the Victim's] death.

Mr. Campbell also was the surviving joint tenant of the residence, and thus became sole owner following the [V]ictim's death. Testimony indicated that the balance of the mortgage was approximately $30,000.00 with the value of the home estimated at $10,000.00 due to its deteriorated condition.

In rebuttal, the Commonwealth introduced the medical records of the [V]ictim from Heritage Valley-Beaver Hospital for the period from 2004 through 2008, which revealed that she was treated on several occasions as a result of injuries sustained by falling. . . . [During trial, the] thrust of [Appellant's] defense was that Mr. Campbell had the motive and opportunity to kill the [V]ictim, since he would benefit financially by her death, and that he had physically abused the [V]ictim in the past.

**B. Facts and Evidence Adduced at the PCRA Hearing Held on August 4, 6[,] and 8 2014**

**1. [Appellant's Trial Counsel,] Thomas Kurt Fuchel**

As noted earlier, the [PCRA] court conducted a hearing on [Appellant's PCRA] petition on August 4, 6[,] and 8, 2014. The [PCRA] court heard testimony during parts of each of those three days. . . . [Appellant] first called Thomas Kurt Fuchel, Sr., Esquire [(hereinafter "Attorney Fuchel")], who was lead defense counsel at the time of trial. He was assisted by a new public defender at that time named Rebecca Fields, who was not called to testify by either party at the PCRA hearing. [Attorney Fuchel] first testified that it was protocol or procedure, at the time of [Appellant's] trial,

for an Assistant Public Defender to begin representation in a case at the preliminary hearing stage and continue with the case through trial. [Attorney Fuchel] did that in this case.

[Attorney Fuchel] testified that he handled the preliminary hearing. He testified that it was his practice to speak with the client prior to the preliminary hearing in the lock-up facility. He did not recall whether he met with [Appellant] before the preliminary hearing in this case, but indicated that was his standard practice. [Attorney Fuchel] could not provide any specific information as to when he met with [Appellant]. He did admit that it was significant to meet with the client early in the case to discuss strategy and to discuss what the [client] did or did not do or know in connection with the charges.

[Attorney Fuchel] indicated that the Commonwealth provided extensive discovery. According to [Attorney Fuchel], [Appellant] complained about not receiving discovery, and [Attorney Fuchel] claims that this prompted him to make sure [Appellant] received the discovery. [Attorney Fuchel] stated that he believed it was his decision regarding what portions of the discovery or other information to use in this case. [Attorney Fuchel] claimed that he had discussions with [Appellant], both before and during trial, regarding what information to use. He conceded that use of prior criminal convictions under [Pennsylvania Rule of Evidence] 609 is a significant tool to impeach witnesses for the opposing side.

[Within Appellant's PCRA petition, Appellant first claimed that trial counsel was ineffective for failing] to use prior convictions and other information for purposes of impeaching key Commonwealth witnesses. [Appellant's counsel] at the PCRA hearing initially questioned [Attorney Fuchel] about a Commonwealth witness by the name of Laura Rankin. [Ms.] Rankin had, and testified to, information regarding [Appellant] using the [V]ictim's credit/debit [card] to make bank withdrawals. [Attorney Fuchel] testified that it was his theory that Robert Campbell, who was a former boyfriend of the [V]ictim, committed the murder. [Attorney Fuchel] continued by stating that he believed that [Ms.] Rankin was actually a helpful witness to the defense because she also had information that

[Appellant] used the [V]ictim's credit/debit card not only at and shortly after the time of the murder, but also prior to that time. [Ms.] Rankin also testified that [Appellant] had the PIN for the credit card further confirming, according to [Attorney Fuchel], that her testimony would actually indicate that [Appellant] did not just use the credit card after the murder, but also before the murder showing his consented-to access to the card. [Attorney Fuchel] thought this was beneficial testimony. . . .

[Appellant's] counsel at the PCRA hearing pointed out and entered exhibits to confirm that [Ms.] Rankin had convictions for retail theft, trademark counterfeiting[,] and theft by unlawful taking, all of which were . . . *crimen falsi*. The Commonwealth confirmed, on cross-examination, that [Attorney Fuchel] did not want to impeach [Ms.] Rankin because she was actually favorable to [Appellant's] position in this case. However, [Appellant's] counsel noted for the [PCRA] court that . . . [Attorney Fuchel] cross-examined [Ms.] Rankin about using crack cocaine in the presence of her child, which was a form of impeachment, but yet chose not to impeach her credibility with [the prior convictions for] *crimen falsi*.

[During Appellant's trial, t]he second Commonwealth witness who had prior criminal convictions was Zachery Valentine. [Mr.] Valentine was [Appellant's] cell mate at the Beaver County Jail, and [Mr.] Valentine testified at trial regarding [Appellant's] admissions about his ([Appellant's]) involvement in the killing.

[Attorney Fuchel] testified that he discussed [Mr.] Valentine with [Appellant], and according to [Attorney Fuchel], [Appellant] confirmed that some of the statements that [Mr.] Valentine made in a report of interview were true. [Attorney Fuchel] claims that he continuously cautioned [Appellant] not to have conversations with [Mr.] Valentine. [Appellant] never admitted his guilt to [Attorney Fuchel], but, according to [Attorney Fuchel], [Appellant] did confirm some of the things that [Mr.] Valentine said.

Interestingly and bewildering to the [PCRA] court was [Attorney Fuchel's] concern about perjury if [Appellant] testified at trial because [Appellant] allegedly said he was

- 17 -

going to lie at trial regarding the statements that [Mr.] Valentine made. This had very little, if anything, to do with regard to why [Attorney Fuchel] did not cross-examine [Mr.] Valentine. When pressed by [Appellant's] counsel at the PCRA hearing, [Attorney Fuchel] confirmed that he [should have] impeach[ed] this type of witness. [Mr.] Valentine had a conviction for theft by deception, and another conviction in Fayette County. [Attorney Fuchel] confirmed that he did not question [Mr.] Valentine about these matters, and [Attorney Fuchel] indicated that it was inadvertent not to use them, that they must have slipped through the cracks[,] and that his decision not to use them was bad in hindsight.

A third Commonwealth witness who testified against [Appellant at trial] was James Sarver. [Mr.] Sarver was another jailhouse informant, who indicated that [Appellant] admitted to the killing. [Mr.] Sarver also had a conviction for terroristic threats. Although not a *crimen falsi* crime, [Mr.] Sarver was on probation, and [Attorney Fuchel] could have questioned [Mr.] Sarver on whether he expected any favorable treatment on a probation violation, which was never done. [Attorney Fuchel] did question [Mr.] Sarver about a simple assault charge that was dismissed. . . . [Attorney Fuchel] conceded that, in hindsight, he should have used the terroristic threats probationary situation for cross-examination purposes at trial. [Attorney Fuchel] could not explain his failure to use this information.

A fourth Commonwealth witness who testified [during Appellant's trial] was Kelly Carter. [Mr.] Carter came to the residence after the crime and was present when Robert Campbell, the person who [Attorney Fuchel] intended to pin blame on, saw blood on a dog at the residence and pointed this out to [Mr.] Carter. [Mr.] Carter had a [prior] conviction for receiving stolen property, which [Attorney Fuchel] did not use to cross-examine [him]. [Attorney Fuchel] indicated that he would normally impeach this type of witness, but did not do so in this case because he believed that [Mr.] Carter's testimony was favorable to the defense in that it tended to implicate [Mr. Campbell].

The fifth Commonwealth witness [to testify at trial] was Brian Silberger. At trial, [Mr.] Silberger testified that

[Appellant] purchased several thousand dollars of crack cocaine from him (Silberger) at or around the time of the murder. [Mr.] Silberger further testified that when he (Silberger) questioned [Appellant] concerning the whereabouts of the [V]ictim, [Appellant] told him [] that the [V]ictim was in Maryland visiting her brother. [Mr.] Silberger had a conviction for burglary and a second conviction for theft by unlawful taking. Both of these crimes were of a *crimen falsi* nature and [Attorney Fuchel] could not recall why he did not use them for cross-examination purposes.

The sixth Commonwealth witness [to testify] was Patrick Brown. [Mr.] Brown was the second witness to testify regarding [Appellant's] drug purchases or attempts to purchase drugs at or around the time of the homicide. [Mr.] Brown conceded that he was informed by the Commonwealth that he would not be charged for providing drugs to [Appellant]. [During trial, Attorney Fuchel] questioned [Mr.] Brown regarding the fact that he would not be charged, going to [Mr.] Brown's bias or motive to testify, but neglected to question him about two pending cases and the potential for favorable treatment or leniency in those cases based on this testimony. [Attorney Fuchel] confirmed that it would make sense to question the witness on these issues, but added that he was not sure he knew about these charges. [Attorney Fuchel] conceded that the use of such impeachment material could increase the chance of [an] acquittal.

The second issue raised by [Appellant] in his PCRA petition [concerned] testimony that revealed [Appellant's] incarceration at the time of trial. [Attorney Fuchel] confirmed that a defense lawyer usually attempts to preclude reference to the client being in jail. [Attorney Fuchel] noted, however, that it was extremely difficult in this case because of others who testified regarding admissions made by [Appellant] and who were in jail with him. [Attorney Fuchel] stated that he did discuss this issue with [Appellant] and confirmed that the reference to being in jail was an important issue.

[Attorney Fuchel] was pressed by [Appellant's PCRA] counsel, and indicated that he [believed] he discussed this

issue in detail with [Appellant], but was not sure. It was at this point that [Attorney Fuchel] added that he had problems communicating with [Appellant] during trial and that most of the problems for this lack of communication [were Appellant's fault]. According to [Attorney Fuchel], he gave discovery to [Appellant] twice. He said he mailed the discovery the first time, and [Appellant] said he did not receive it. This, according to [Attorney Fuchel], prompted him to go to the jail personally and deliver the discovery in the presence of the Assistant Warden. [Attorney Fuchel] said there were two occasions at the jail when he had problems with [Appellant].

[Attorney Fuchel] testified that, at one of these two instances, [Appellant] became very physical and threw the public defender's paralegal, Dionna Steele, to the ground and went after [Attorney Fuchel]. [Attorney Fuchel] stated that [Appellant] became verbally abusive on a second occasion. He indicated that [Appellant] caused these disruptions.

As to the issue of [Appellant] being in jail, [Attorney Fuchel] added that it was trial strategy for this information to come into evidence because [Attorney Fuchel] thought it would be helpful for the jury to know that the individuals who were testifying were also in jail.

The Commonwealth brought out the fact that they objected when [Attorney Fuchel] went down this road, and [Attorney Fuchel] asked for a sidebar with the court at trial and confirmed that he wanted this information before the jury. The Commonwealth stipulated that the information came before the jury at the request of [Appellant] with no objection or curative instruction requested.

[Attorney Fuchel] was also questioned regarding the third issue raised by [Appellant in the PCRA petition], namely whether Zachery Valentine was acting as an agent of the government when he was debriefed by the Commonwealth and then placed back in the same cell with [Appellant]. [Appellant's PCRA] counsel assert[ed] that this [gave] rise to the basis for a motion to suppress the statements [Appellant] made to [Mr.] Valentine on the basis that [Mr.] Valentine may have been acting as an agent for the

Commonwealth in securing admissions without [***Miranda***] warnings. [Attorney Fuchel] said he did not know that [Mr.] Valentine was questioned and placed back in the same cell and never considered this issue or argument.

. . .

**2. [Appellant]**

[Appellant] also testified at the PCRA hearing. . . . [Appellant] testified that [Attorney Fuchel], with the assistance of another Assistant Public Defender, Beth Manifesto, handled his preliminary hearing on August 1, 2009. [Appellant] testified that he never met with [Attorney Fuchel] prior to the preliminary hearing and that [Attorney Fuchel] never came to the jail to see him and never spoke with him in the lock-up prior to the preliminary hearing. The first time that [Appellant] actually met with, and saw [Attorney Fuchel] was in the courtroom when the preliminary hearing occurred.

The next step in the process was the arraignment in October [] 2009. [Appellant] was incarcerated between the time of the preliminary hearing and the arraignment, and testified that he had no contact with [Attorney Fuchel] between the time of the preliminary hearing and the arraignment.

[Appellant] stated that a private investigator for the public defender's office did come to the jail in early 2010 to gather information and that [Attorney Fuchel] came to the jail later in January [] 2010 and several times between January [] 2010 and the time of trial in July [] 2010.

[Appellant] confirmed that paralegal Dionna Steele came to the jail several times to meet with him, and on one occasion [Attorney Fuchel] was also present. As to the incident in which [Attorney Fuchel] claimed that [Appellant] became verbally abusive and physical, [Appellant] testified that [Attorney Fuchel] actually got in his face and that he ([Appellant]) did not get physical with [Attorney Fuchel]. [Appellant] stated that the incident got very loud and that a jail guard came into the room because of the noise.

According to [Appellant], Dionna Steele advised the guard that [Appellant] did nothing wrong.

[Appellant] went on to state that, after his conviction in this case, he had to file his own appeal because [Attorney Fuchel] neglected to timely file the appeal. No post-sentence motion was filed. [Attorney Fuchel] requested several extensions to file a brief for the appeal, and the appeal was eventually remanded to the trial court by the Superior Court because of this. [Appellant's PCRA counsel was] appointed and handled [Appellant's direct] appeal.

[Appellant] testified that[,] throughout the trial[] and [the] early appeal proceedings, [Appellant's] mother was providing letters to [Attorney Fuchel], [to] which [Attorney Fuchel] failed to respond[]. [Appellant] filed his own PCRA petition in September [] 2013 and [PCRA counsel] filed [an amended PCRA petition] in April[] 2014.

[Appellant] did address specific comments and allegations raised by [Attorney Fuchel]. As to the testimony of Zachery Valentine, [Appellant] advised that [Attorney Fuchel] told him that [Mr.] Valentine was going to testify that [Appellant] confessed to [Mr.] Valentine and that this testimony may hurt at trial. [Appellant] testified that he never said he would perjure himself. According to [Appellant], he [] requested that [Attorney Fuchel] cross-examine [Mr.] Valentine with impeachment material, and [Attorney Fuchel] responded that he did not want to complicate the case. [Appellant] was adamant about the fact that he pressed [Attorney Fuchel] to impeach [Mr.] Valentine.

As to Laura Rankin, [Appellant] claim[ed] that he actually brought some of the *crimen falsi* convictions to [Attorney Fuchel's] attention. [Appellant] testified that [Attorney Fuchel] never advised [Appellant] that he [would not] use the information against [Ms.] Rankin because she was favorable. Instead, [Appellant] testified that [Attorney Fuchel] did not even know about [Ms.] Rankin's prior convictions until [Appellant] brought them to his attention.

With regard to all of the Commonwealth witnesses who had prior convictions, [Appellant] testified that he was not

aware that a corrupt and polluted source charge was in order and that [Attorney Fuchel] never requested one. It was only after present [] counsel brought this to [Appellant's] attention that he was aware of this.

As to the issue of [Appellant's] incarceration being brought up at trial, [Appellant] stated that [Attorney Fuchel] told him . . . that Robert Campbell had already testified to it and therefore it would come in. According to [Appellant], [Attorney Fuchel] never discussed this issue with him in advance or whether it was part of the trial strategy. [Appellant] claimed that he knew it was not right for this information to come in because the sheriff went to great lengths to keep the jury from seeing [Appellant] being escorted to the courtroom by deputy sheriffs in handcuffs and shackles during breaks in the trial.

[Appellant] testified that when it was time for the defense case to begin, [Attorney Fuchel] called multiple witnesses in a brief period and then turned to [Appellant] and said "you're next, but I suggest you not testify." [Appellant] contends that this [was] the only time [Attorney Fuchel] discussed with him whether or not to testify.

With regard to the third issue, namely, Zachery Valentine potentially being an agent of the government, [Appellant] testified [that Attorney Fuchel] never discussed this issue with him. It came to light that [Mr.] Valentine had testified for the Commonwealth in other cases and that neither [Appellant] nor [Attorney Fuchel] knew this.

[Appellant] testified that he wrote a letter to the trial judge [] regarding [his] failure to receive discovery. [Appellant] claims that [Attorney Fuchel] came to the jail angry after receiving notice that [Appellant] wrote a letter to the judge. [Appellant] claims that [Attorney Fuchel] came into the cell, crumbled the letter, told [Appellant] never to write a letter to the judge again, told [Appellant] that he ([Attorney Fuchel]) was going to trial with what information he had, and told [Appellant] that he ([Appellant]) was going to burn. After this discourse, [Attorney Fuchel] left the cell. . . .

. . .

- 23 -

### 3. [Detective] Robert Chamberlain

[Appellant] also called Beaver County Detective Robert Chamberlain as a witness at the PCRA hearing. [Detective] Chamberlain was a co-affiant on the criminal charges filed against [Appellant]. The Detectives' Bureau is part of the Beaver County District Attorney's Office. Detective Chamberlain was questioned about the involvement of Zachery Valentine in this case and his use as a witness by the Commonwealth. [Detective] Chamberlain testified that he did not know Zachery Valentine prior to [Appellant's] case. [Detective] Chamberlain testified that he met with [Mr.] Valentine twice during [Appellant's] case.

According to [Detective] Chamberlain, [Mr.] Valentine first came to the attention of the Commonwealth when [Mr.] Valentine's wife called the District Attorney's Office and advised that a representative of the District Attorney should speak to [Mr.] Valentine regarding [Appellant's] case. This caused the District Attorney's Office to request transport of [Mr.] Valentine from the Beaver County Jail to the Beaver County Courthouse for questioning on May 18, 2009, prior to the trial in this case. [Detective] Chamberlain advised that he secured all of [Mr.] Valentine's knowledge and information in the interview of May 18, 2009 and had no intention of speaking with [Mr. Valentine] again short of requesting his testimony at the trial. [Detective] Chamberlain did indicate that there eventually arose the need for a second meeting for the purpose of having [Mr.] Valentine draw a diagram of the crime scene. [Detective] Chamberlain indicated that he did not know that [Mr.] Valentine had served as a witness for the Commonwealth in prior cases at the time he interviewed [Mr.] Valentine in 2009. [Detective] Chamberlain learned this later through discussion with another Beaver County Detective, Kim Clements. According to [Detective] Chamberlain, [Mr.] Valentine expressed fear of being in the same cell with [Appellant], and [Detective] Chamberlain testified that he never told [Mr.] Valentine to keep his eyes and ears open about the case or to solicit any further information from [Appellant] after the initial interview on May 18, 2009.

On cross-examination, [Detective] Chamberlain testified that he was able to corroborate [Mr.] Valentine's information given during the interview. In fact, [Detective] Chamberlain stated that he left the interview room on several occasions during the interview to check [Mr.] Valentine's statement and was able to confirm what he was saying based upon review of phone records and photos of the crime scene. [Detective] Chamberlain was the final witness called by [Appellant].

## 4. [Detective] Kim Clements

The [Commonwealth] commenced its case on Friday, August 8, 2014. [The Commonwealth] first called Detective Kim Clements. [Detective] Clements testified regarding Zachery Valentine. She [testified] that she knew [Mr.] Valentine as a result of his prior testimony for the Commonwealth in another homicide case. She did participate in [Mr.] Valentine['s] interview on May 18, 2009. [Detective] Clements testified that she played no part in arranging for [Mr.] Valentine to be interviewed or in his involvement in this case. She confirmed that it was [Mr.] Valentine's wife who brought him to the attention of the prosecution. [Detective] Clements also confirmed that neither she nor anyone else from the prosecution gave [Mr.] Valentine any instructions to pursue further information from [Appellant] or to act as an agent for the Commonwealth.

On cross-examination, [Detective] Clements [testified] that . . . she never instructed [Mr. Valentine] . . . to come back with [] additional information after the first interview. . . . [Detective] Clements confirmed that there was a second interview of [Mr.] Valentine and also stated that she was involved in his preparation for testimony at trial.

## 5. [Chief] Eugene St. Clair

The next Commonwealth witness was Chief Eugene St. Clair of the Freedom Police Department. [Chief] St. Clair is now the chief, but was a sergeant at the time of [Mr.] Valentine's interview. [Chief] St. Clair was the co-affiant on the criminal charges with Detective Chamberlain. [Chief] St. Clair indicated that he could not recall all of the details

of the interview without referring to his report and was permitted to do so. [Chief] St. Clair did recall that [Mr.] Valentine gave specific information regarding [Appellant's] statement that coincided with evidence found at the crime scene. [Chief] St. Clair also confirmed that he gave no instructions to [Mr.] Valentine to solicit any additional information from [Appellant]. The one thing that [Chief] St. Clair testified to that was inconsistent with [Detectives] Chamberlain and Clements was that [Chief] St. Clair's report rais[ed] the inference that there were a number of interviews with [Mr.] Valentine. There are no other specifics on dates of the interviews. Also, there was additional information in [Chief] St. Clair's report that was not in [Detective] Chamberlain['s] report, but no major inconsistencies. [Chief] St. Clair did not know [Mr.] Valentine prior to the interview in question. [Chief] St. Clair indicated that he only interviewed [Mr.] Valentine in the presence of Beaver County detectives, but did recall that he was involved in interviews on more than one occasion.

**6. Dionna Steele**

The final witness called by the Commonwealth was Dionna Steele, a paralegal in the Beaver County Public Defender's Office. . . . Reference to Attorney Fuchel's testimony above reflects that [Attorney Fuchel] testified to an incident at the Beaver County Jail in which [he] claimed that [Appellant] became hostile in an attorney interview room with Dionna Steele present. [Attorney Fuchel] testified that [Appellant] pushed Ms. Steele to the ground and came after [Attorney Fuchel]. Ms. Steele gave quite a different version of that event. She recalled that she took an envelope to the jail from Attorney Fuchel to deliver to [Appellant]. She indicated that she had met with [Appellant] on a number of occasions at the jail and never had a problem with him. On the particular occasion when she took the envelope to the jail for Attorney Fuchel, she was in the attorney meeting room with [Appellant] when [Attorney Fuchel] entered the room. She testified that [Attorney Fuchel] began yelling at [Appellant] and [Appellant] began to yell back. She became frightened and stepped back. She actually pushed the emergency button in the room because of the situation. She stated that [Attorney Fuchel] began to back up and actually backed into her. [Appellant] thought she might fall

and grabbed her arm to prevent her from falling. Other than this, [Ms.] Steele testified that [Appellant] never touched her. A jail guard came into the room, and [Ms.] Steele told the guard that [Appellant] did not do anything wrong.

On both direct and cross-examination, [Ms.] Steele testified that it was Attorney Fuchel who got into [Appellant's] face. She specifically testified that the situation was escalated by Attorney Fuchel pounding on the table. She was startled by Attorney Fuchel's actions and specifically recalled that he walked toward [Appellant] and got into his [] face. She said that [Attorney Fuchel] was within inches of [Appellant's] face. She stated that [Attorney Fuchel] was very angry and was clearly the aggressor in this situation. According to [Ms.] Steele's testimony, the relationship between the two was hostile from that point forward.

[Appellant's] counsel pressed [Ms.] Steele on cross-examination and was successful in getting [Ms.] Steele to say that [Appellant] never gave her a problem throughout the time that she met with him prior to trial. In fact, she stated that [Appellant] was always respectful. She stated that [Appellant] was very frustrated in her discussions with him about discovery and the fact that he ([Appellant]) was not receiving anything from [Attorney Fuchel]. [Ms.] Steele stated that she told the jail guard that [Appellant] did nothing wrong in the attorney meeting room because she believed that and did not want to see [Appellant] receive sanctions at the jail. . . .

PCRA Court Opinion, 11/19/14, at 1-34 (some internal capitalization and citations omitted).

The PCRA court denied Appellant post-conviction collateral relief in an order entered on November 19, 2014. Appellant field a timely notice of appeal and now raises the following claims to this Court:

1. Did the unjustified failure to impeach central prosecution witnesses in this case with relevant aspects of their criminal records, pending charges[,] and current probationary status

establish all three of the prongs of the test for ineffective assistance of counsel under Pennsylvania law?

2. Was trial counsel ineffective for eliciting a statement from a Commonwealth witness about the prior incarceration of [Appellant], which, once that fact was brought out, allowed the jury to carry with it the unforgettable picture of [Appellant] sitting in jail, convicted of crimes and of such a character that he was more likely to commit the crime for which they were now tasked with judging [Appellant]?

3. Was trial counsel ineffective for failing to present a motion to suppress a confession surreptitiously obtained by a jailhouse informant because the manner in which the confession was obtained violated [Appellant's] Sixth Amendment rights where the informant was acting pursuant to an implied understanding with the district attorney and where the informant was returned to the same cell with [Appellant] even after the informant told detectives that he was afraid to return to the same cell?

Appellant's Brief at 4 (some internal capitalization omitted).

We have reviewed the briefs of the parties, the relevant law, the certified record, and the well-written and through opinion from the able PCRA court judge, the Honorable James J. Ross. We conclude that the claims raised in Appellant's brief fail and that Judge Ross' opinion, filed on November 19, 2014, meticulously and accurately explains why Appellant's claims fail. Therefore, we adopt the PCRA court's opinion as our own. In any future filings with this or any other court addressing this ruling, the filing party shall attach a copy of the PCRA court's opinion.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/16/2015

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY
PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA           :
                                       :
        v.                             :        No. 1592 of 2009
                                       :
BENJAMIN J. DENNERLEIN                  :

ROSS, J.                                        November ___18___, 2014

## MEMORANDUM OPINION

### INTRODUCTION

On June 17, 2009, the defendant, Benjamin J. Dennerlein, was charged with a general charge of homicide by the Freedom Borough Police Department in conjunction with the assistance of the Beaver County District Attorney Detectives Bureau. The charges stem from an incident that occurred in Freedom Borough, Beaver County, Pennsylvania, in either the late evening hours of May 12 or early morning hours of May 13, 2009. The victim, Elizabeth Grosskopf, was found dead in her residence at 1475 Fifth Avenue Freedom Borough, Beaver County, Pennsylvania. An autopsy determined that Grosskopf died due to multiple stab wounds to the head and neck areas. After an investigation by the Freedom Borough Police and the Beaver County Detectives' Bureau, the defendant was charged with homicide.

The case was scheduled for a jury trial before the Honorable John Dohanich, now Senior Judge of this Court, with jury selection taking place on Monday, July 26, 2010. After the jury was selected, the case proceeded to trial, and the jury convicted defendant of first

degree murder on August 3, 2010. On September 29, 2010, Judge Dohanich sentenced the defendant to life imprisonment without parole.

No post-sentence motions were filed, but a timely notice of appeal was filed with the Superior Court, by the defendant himself, on October 27, 2010. The appeal was denied, and the conviction was affirmed, by Opinion and Order of the Superior Court dated April 2, 2012. A timely petition for allowance of appeal was presented to the Pennsylvania Supreme Court, which was denied by Order of the Supreme Court dated October 22, 2012.

The defendant filed a timely *pro se* petition for post-conviction relief, and Attorney Mitchell Shahen was appointed by the Court to represent the defendant in the post-conviction proceedings. Attorney Shahen filed an Amended Petition for Post-Conviction Collateral Relief with this Court on April 7, 2014, which was timely based upon granted motions for extension of time. The Commonwealth filed a response and memorandum in opposition to the petition, and defense counsel filed a brief in support.

The Court conducted a hearing on the petition on August 4, 6 and 8 of 2014, receiving the testimony of various witnesses on those dates. The Court also received exhibits and has reviewed the court file as well as the transcripts of the trial. For the reasons stated below, defendant's petitions are denied.

## FACTS

A.      Facts and Evidence Adduced and Presented at Trial
         In July and August, 2010

After the defendant filed his notice of appeal, Judge Dohanich issued an Order requiring the defendant to file and serve a concise statement of errors complained of on appeal pursuant to Pa.R.App.P. §1925(b), which the defendant did. Judge Dohanich

2

authored an opinion regarding the errors complained of on appeal on April 7, 2011. In that opinion, Judge Dohanich recited the facts established at the jury trial. The Court has reviewed the transcripts of the trial and believes that Judge Dohanich has accurately captured and summarized the facts established, and the Court reiterates those facts in the following pages.

The victim, Elizabeth Grosskopf, age 54, resided at 1475 Fifth Avenue, Freedom, Beaver County, in a residence owned by her and Robert Campbell, a former paramour, with whom she maintained a friendly relationship. Ms. Grosskopf was a frail woman in poor health, suffering from various medical conditions which caused her to be unsteady and prone to falling on occasion. Ms. Grosskopf and Mr. Campbell purchased the residence in 2003, subject to a mortgage; however, the property was titled solely in Ms. Grosskopf's name because of Mr. Campbell's unstable financial condition. Subsequently, Ms. Grosskopf transferred the title by deed dated February 28, 2008, to herself and Mr. Campbell, as joint tenants with the right of survivorship. The victim and Mr. Campbell previously lived together for approximately ten years until May, 2008, when Mr. Campbell left the residence to commence a live-in relationship with his current wife, Karen Otrhalik Babich. Mr. Campbell and Ms. Babich commenced their relationship in December, 2007, which culminated in their marriage in October, 2008.

Mr. Campbell's last contact with the victim occurred on May 8, 2009, when she telephoned to inform him that on May 7, 2009, she had received and deposited the sum of $31,128.14, representing her share of the proceeds from the sale of her parents' cottage in Erie. They discussed the uses to which she could put the funds. Ms. Grosskopf maintained a personal checking/credit/debit account with the Northern Lights branch of ESB Bank

3

which she opened May 19, 1997. The account was limited to withdrawals of $510.00 per 24-hour period.

Mr. Campbell was introduced to the defendant approximately four years prior to the victim's death while both were inmates in the Beaver County Jail for reasons unrelated to the instant case. Upon release from incarceration, Mr. Campbell and the defendant maintained a friendly relationship, and the defendant resided with Mr. Campbell and Ms. Grosskopf from time to time when he was in need of a temporary residence. All three individuals were users of and smoked cocaine together on occasion. In December, 2008, and continuing until the time of her death, the defendant resided at the victim's home, paying rent in the amount of $50.00 per week. The defendant was employed at Crow's Run Recycling as a salesperson from 2008 through May 13, 2009.

Prior to her death, the victim was employed as a cashier at the Center Township Wal-Mart. Ms. Grosskopf last worked on May 11, 2009, from 11:00 A.M. until 8:00 P.M. and was observed at work by her neighbor, Dwight McMorris, while he was shopping at Wal-Mart. Mr. McMorris subsequently observed the victim between 8:40 P.M. and 8:50 P.M. on the same day as she drove by his home on the way to her residence after completing her work day. Mr. McMorris was the last person other than the perpetrator to see Ms. Grosskopf alive.

The victim was scheduled to work on May 12, 2009, from 11:00 A.M. to 8:00 P.M.; however, she did not appear for work nor call to indicate that she would not be present for work that day, which was unlike her because she was a reliable employee. Shortly before her death, Ms. Grosskopf reported to one of her co-workers, Nancy Pranskey, that the defendant had been stealing from her and using her credit/debit card to purchase items.

4

Bank records disclosed that on May 5, 2009, the victim's bank account had been overdrawn by $741.11 as a result of eight transactions.

The defendant also did not appear at his place of employment on May 12, 2009, and terminated his employment due to a disagreement with his employer, Nick D'Itri, by way of a text message on May 13, 2009, at 12:52 P.M. The defendant had been a good employee until approximately one month prior to terminating his employment when he began not reporting for work. The prior week he failed to appear for work on four consecutive days. His employer suspected that drug use was responsible for the defendant's decline in performance. The defendant's last working day was May 11, 2009.

Between 10:00 A.M. and 10:30 A.M. on May 12, 2009, Mr. Campbell sought the defendant at his place of employment. Not locating him at work, Mr. Campbell proceeded to the victim's residence and found the defendant present. Mr. Campbell noted that the defendant appeared to be under the influence of drugs. When Mr. Campbell inquired of the defendant as to the whereabouts of the victim, the defendant replied that he had taken her to work earlier that morning, because he was in need of her vehicle to run errands. Mr. Campbell, who maintained various items of personal property at the residence, searched the home to assure that his belongings were present and was followed through the house by the defendant. When looking into the victim's bedroom, Mr. Campbell observed that the bed had been made, which was unusual because the victim was a poor housekeeper and never made the bed. The defendant was directly behind Mr. Campbell as he was in the doorway to the victim's bedroom. The defendant and Mr. Campbell became involved in a heated argument over the defendant not working to pay rent to the victim and his drug use. Mr. Campbell informed the defendant that he would return to the residence between 8:30

5

P.M. and 9:00 P.M., when the victim returned from work, to speak with the defendant and the victim.

Later in the same day at 3:25 P.M., the defendant, using the victim's credit/debit card, made a balance inquiry at ESB Bank located at 921 Third Avenue in New Brighton. The defendant, utilizing the victim's credit/debit card, purchased various items at the Chippewa Township K-Mart between 6:51 P.M. and 7:09 P.M. and proceeded to the home of Gregory "Wimpy" Price and Wendy McCoy to deliver items to Mr. Price, including video games, movies and an electric can opener, to reimburse Mr. Price for tires that he purchased from the defendant and which were not appropriate for his vehicle.

At between 8:30 P.M. and 9:00 P.M. on May 12, 2009, Mr. Campbell and his wife returned to the victim's residence and found no one present. The victim's vehicle was not in the area. Throughout the evening and into the early morning hours of May 13, 2009, Mr. Campbell attempted on 30 occasions to reach the defendant and on 17 occasions to contact the victim by telephone and through text messages indicating his desire to speak to them. He received no responses, except that the defendant sent a text message advising that the Baden police would be interested in Mr. Campbell's use of marijuana. During the evening, Mr. Campbell and his wife left and returned to the victim's residence on two additional occasions and did not find anyone or the victim's automobile at the home. They left for the final time at approximately 12:00 A.M, returned to their residence and retired for the night.

On May 13, 2009, at approximately 12:26 A.M., the defendant checked into Room 12 of the Beaver Falls Motel in Beaver Falls, following which he contacted Laura Rankin asking her to join him in smoking crack cocaine. Ms. Rankin telephoned Jennifer Burns, requesting that she provide transportation to the motel. Jennifer Burns and Bryan Silberger retrieved

6

Ms. Rankin and her infant child and drove to the motel to meet the defendant. Ronald "Toot" Goodman, the father of a child with Ms. Burns, and Patrick Brown, a supplier of crack cocaine for the defendant, also appeared at the motel. Mr. Brown provided the cocaine to the defendant. The defendant, when asked the reason for being in possession of the victim's vehicle, informed Ms. Rankin that the victim was away on vacation visiting her niece in Maryland or Virginia. The defendant told Mr. Silberger that the victim was away in Maryland to visit her brother for a week. The defendant, in an effort to assure Mr. Brown, his cocaine supplier, that he had sufficient funds when requesting Mr. Brown to provide an advance of drugs, had previously forwarded a text message to him on May 9, 2009, showing a balance in the victim's bank account of $29,712.14. The defendant and the other individuals smoked crack cocaine throughout the early morning hours of May 13, 2010, until approximately 5:00 A.M. During that time, the defendant and Ms. Rankin left the motel and proceeded to two convenience stores to purchase items and attempted to obtain funds using the victim's credit/debit card. At one point in time, the defendant advised Ms. Rankin that he was using the victim's credit/debit card, showed her the balance in the account and stated to her, "stick with me and good things will happen".

Mr. Campbell, accompanied by two friends, Martin Costanza and Justin Hertnecky, proceeded to the victim's residence on May 13, 2009, between 8:30 A.M. and 9:00 A.M. No one was present and the victim's car was not at the residence. The three of them gathered the defendant's belongings, placed them in garbage bags and stored the bags in the garage of the residence. Mr. Campbell opened the victim's bedroom door and found the bed in the same condition as the day before, as if it had not been disturbed. They then left the

7

residence and returned to Mr. Campbell's house for the balance of the morning. Mr. Campbell's intention was to evict the defendant.

After leaving the motel and driving his friends home, the defendant claimed to have returned to the victim's residence to locate her, found that she was not present, that her bed did not appear to have been slept in, and then proceeded to the Beaver Valley Mall. At 1:15 P.M. on May 13, 2009, the defendant presented a check made payable on the victim's account to himself in the amount of $1,000.00 at the ESB Bank in Beaver Falls. The memo portion of the check indicated the words "roof/porch". The defendant explained that he had performed work for the victim and the check represented payment. Ms. Celeste, the victim's next door neighbor, indicated that no recent work had been done on the house. The bank representative requested identification from the defendant, since he did not have an account with the bank, and he provided his driver's license. The check was drawn on the Northern Lights ESB Bank located in Baden. The Beaver Falls ESB Bank manager telephoned the Northern Lights branch and obtained a facsimile of the signature card of the victim. The Beaver Falls branch manager also placed two telephone calls to the victim's residence and the telephone was not answered on either occasion. After being unable to verify the defendant's correct address and telephone number or the victim's signature, the bank refused to cash the check and returned the check to the defendant.

Trooper Robert Negherborn, a forensic document examiner with the Pennsylvania State Police Crime Laboratory, recovered from the face of the subsequent check in the victim's checkbook the impression of the writing depicting the text of the previous check payable to the defendant, including the authorizing signature. He was further provided with handwriting samples of the victim and the defendant. Although not issuing a

8

conclusive opinion, Trooper Negherborn testified that in comparing the writing on the check with the samples of the handwriting of the victim and the defendant, there was a strong probability that the signature on the check was not that of the victim. He further opined that there were no significant similarities to indicate that the victim or the defendant wrote the entries on the check, or that the defendant wrote the signature on the check.

At approximately 2:00 P.M. on May 13, 2009, the defendant purchased tennis shoes at the Shoe Department Store at the Beaver Valley Mall using the victim's credit/debit card. A short time later he attempted to return the tennis shoes for a cash refund without the credit/debit card and was refused. The defendant was accompanied by Ms. Rankin and met Mr. Price while at the Beaver Valley Mall and purchased other items with the victim's credit/debit card. He also attempted to buy tennis shoes for Mr. Price using the victim's credit/debit card and was refused.

At approximately 1:00 P.M., Kelly Carter, who had previously made payment of $500.00 for the purchase of an automobile from the defendant, telephoned the defendant informing him that he was at the residence desiring to retrieve the vehicle from the garage. The defendant advised Mr. Carter that he would not arrive for a period of time, and Mr. Carter waited. When the defendant failed to appear, Mr. Carter made a second telephone call, at which time the defendant instructed Mr. Carter to enter the home to obtain the remote control for the garage door. At the direction of the defendant, Mr. Carter entered the house by way of a window and was unable to locate the remote control while continuing to speak to the defendant on the telephone. Mr. Carter then telephoned Mr. Campbell, who subsequently arrived and informed Mr. Carter that he was in possession of

9

the remote control and would not permit the removal of the vehicle until the defendant appeared. Mr. Carter placed a third call to the defendant, who indicated he would return later. Both Mr. Campbell and Mr. Carter observed what appeared to be blood on the victim's dog and entered the house to investigate. Mr. Campbell entered the victim's bedroom and discovered a pool of blood on the bed where the blanket had been pulled away. He called Mr. Carter into the bedroom to observe the blood. Mr. Carter then telephoned the defendant, informed him of their findings and inquired whether he knew the whereabouts of the victim, to which the defendant replied that he thought she was at work. Mr. Carter told the defendant he should return to the residence immediately. The defendant indicated that he was at the Beaver Valley Mall and would return home at a later time. He also stated that he had not been at the residence for several days. Mr. Campbell, after contacting the victim's employer and the hospital in an unsuccessful attempt to locate her, placed a call to 9-1-1 at 2:54 P.M. Freedom Borough Chief of Police John Hill and Officer William Dreyer of the Freedom Borough Police Department responded to the call at approximately 3:00 P.M. Andrew Gall of the Beaver County Detective Bureau received a call for assistance from the Freedom police officers at 3:10 P.M. and responded to the residence with County Detectives Timothy Staub, Kim Clements, Timmie Patrick and Robert Chamberlain.

A search of the residence disclosed the victim's body wrapped in blankets in a stairway on the second floor leading to the attic, which was located between the bedrooms of the victim and the defendant and could be accessed from both bedrooms. The police found no evidence of forced entry into the home. When informed of Ms. Grosskopf's death, Mr. Campbell became extremely distraught. As a result of receiving information from Ms.

10

Rankin's mother that Ms. Rankin was with the defendant in her vehicle at the Beaver Valley Mall, a BOLO (be on look out) alert was broadcast for the defendant, the victim's vehicle and the vehicle being operated by Ms. Rankin and owned by her mother. Ms. Rankin received telephone calls from a friend and her mother advising that the names of the defendant and Ms. Rankin were heard on the scanner indicating that the police were attempting to locate the defendant.

Detective Patrick proceeded to the defendant's place of employment and in speaking to Mr. D'Itri found that the defendant last worked on May 12, 2009, and terminated his employment on May 13, 2009. Mr. D'Itri provided the defendant's cellular telephone number to Detective Patrick, who attempted several calls and text messages to the defendant with no response.

At 6:07 P.M., Officer Maxim Strano of the Center Township Police Department, in response to the alert, located the defendant and Ms. Rankin in the automobile being operated by Ms. Rankin as it was backing out of a parking space at the Beaver Valley Mall. The defendant stated to Ms. Rankin "to go or he was going to run". Officer Strano drew his weapon, ordered both individuals to the ground, approached the defendant and placed him in handcuffs. The defendant stated that he thought about running and should have run when he saw the officer. The defendant also indicated that Officer Strano had the wrong man. The victim's credit/debit card was found in the defendant's wallet. The victim's vehicle was also located a short distance away.

The defendant and Ms. Rankin were transported to the Center Township Police Department. At 6:39 P.M., the defendant waived his Miranda rights and agreed to speak with Detectives Patrick and Clements. The defendant was informed of Ms. Grosskopf's

11

death and showed no emotion. He indicated that in the evening hours of May 11, 2009, he and his girlfriend, Colleen Cantella, were at the victim's residence viewing the Pittsburgh Penguins/Washington Capitals hockey game. The defendant further advised that the victim came home from work during the hockey game. According to the defendant, Ms. Cantella departed after the hockey game to return to her residence. This information was contrary to the statement made by Ms. Cantella that she was not at the victim's residence on May 11th and that the two of them had exchanged text messages between 9:23 P.M. and 10:07 P.M. near the end of the hockey game, when she was at her own residence. The defendant stated that on May 12, 2009, he drove the victim to work at Wal-Mart at approximately 10:00 A.M., attended to several errands and returned to the residence, when he made contact with Mr. Campbell and a verbal argument ensued. After the disagreement with Mr. Campbell, he advised that he left the residence, ran a few more errands and went on a crack cocaine binge. He stated that he returned to Wal-Mart between 8:00 P.M. and 8:30 P.M. to pick up Ms. Grosskopf, and when she did not come out to the vehicle, he went into the store and was told that she was not at work all day. He also advised the detectives that he tried to call Ms. Grosskopf and received no reply. The victim did not report for work on May 12, 2009, and video footage of the entrance and the customer service area of Wal-Mart disclosed that the defendant did not appear at the relevant time. He obtained crack cocaine from Mr. Price and checked into the Beaver Falls Motel to smoke crack cocaine with Ms. Rankin and her friends. They all remained at the motel into the early morning hours of May 13, 2009. He advised that he checked out of the Beaver Falls Motel at approximately 11:00 A.M. and returned to the residence to look for the victim. He found that her bed was made and did not appear to have been slept in. The defendant then proceeded to the

12

Beaver Valley Mall where he met Mr. Price and offered to purchase tennis shoes for him as payment for cocaine previously supplied by Mr. Price. The defendant attempted purchases at two separate retail locations using the victim's credit/debit card and was rejected. The defendant advised that he had the information regarding the victim's credit/debit card, including the victim's personal identification number (P.I.N.) to access the account. The defendant related that he obtained the credit/debit card from the victim's purse located in the kitchen of the residence. The detectives were unable to locate the victim's purse in the kitchen of the home and subsequently found it in the victim's vehicle. Upon receiving this information, the defendant informed the detectives that he had taken the credit/debit card out of the victim's purse and placed the purse in the automobile. The defendant claimed to have permission from the victim to use the credit/debit card. Near the conclusion of the interview, which lasted approximately one hour, the defendant stated to the detectives that if they were going to arrest him for murder to do so. He further stated that "all I have to do is convince one person" that he did not commit the offense. The victim's purse, Wal-Mart identification card, driver's license, checkbook and cellular telephones were all located in the victim's vehicle, which was in the possession of the defendant.

Prosecutors acquired the victim's bank records for the period from May 1, 2009, through May 31, 2009, the telephone records of the defendant from May 8, 2009, through May 14, 2009, and located various receipts for purchases and automatic teller machine (ATM) withdrawals from the victim's account in the vehicles of the victim and Ms. Rankin and in the trash bin at the Beaver Falls Motel. A summary of these records in chronological order was outlined by Detective Chamberlain as follows:

**May 9, 2009:**

13

1.  11:43 P.M. – Text message from defendant to Patrick Brown of a photograph of a $100.00 withdrawal from the victim's account, and indicating a balance of $29,712.14

## May 10, 2009:

1.  2:16:03 A.M. - $100.00 ATM withdrawal from ESB Bank, New Brighton
2.  2:16:22 A.M. - $200.00 ATM withdrawal from ESB Bank, New Brighton
3.  2:17 A.M. – Telephone call from defendant to Gregory Price
4.  7:31:13 A.M. - $100.00 ATM rejected withdrawal, ESB Bank, New Brighton
5.  7:31:39 A.M. – ATM balance inquiry, ESB Bank, New Brighton, showing balance of $29,312.14
6.  7:31:57 A.M. - $20.00 ATM rejected withdrawal, ESB Bank, New Brighton
7.  7:35:34 A.M. - $102.50 ATM/Mac machine rejected withdrawal, Beaver Falls
8.  7:44:04 A.M. – ATM rejected balance inquiry, ESB Bank, New Brighton
9.  7:44:16 A.M. – ATM rejected balance inquiry, ESB Bank, New Brighton
10. 7:44:29 A.M. – $100.00 ATM rejected withdrawal, ESB Bank, New Brighton
11. 7:44:39 A.M. - $20.00 ATM rejected withdrawal, ESB Bank, New Brighton
12. 7:46:34 A.M. - $100.00 ATM rejected withdrawal, ESB Bank, New Brighton (defendant is displayed on video at the ATM machine)
13. 7:54:02 A.M. - $102.00 ATM rejected withdrawal, BP, East Rochester

## May 11, 2009:

1.  9:23 P.M. through 10:07 P.M. – Several text messages between defendant and Colleen Cantella, the defendant's girlfriend regarding the hockey game
2.  9:54 P.M. – Telephone call from defendant to Gregory Price
3.  10:46 P.M. – Text message from defendant to Gregory Price stating "If I come with $200.00, can you do anything?"
4.  11:05 P.M. – Text message from defendant to Gregory Price stating "If I come with $200.00, can you do anything?"
5.  11:19 P.M. – Text message from defendant to Patrick Brown stating "Can I come to you now?"
6.  11:33 P.M. – Text message from defendant to Patrick Brown stating "Can I come to you now?"

## May 12, 2009:

1.  12:29 A.M. – Telephone call from defendant to ESB Bank automated telephone number
2.  12:48 A.M. – Telephone call from defendant to Gregory Price
3.  12:55 A.M. – Purchase using the victim's credit/debit card at East Rochester GetGo for 99¢.
4.  12:55 A.M. - $10.00 gasoline purchase using victim's debit card at East Rochester GetGo

14

5.   1:04:11 A.M. - $200.00 ATM withdrawal, ESB Bank, New Brighton
6.   1:04:28 A.M. - $200.00 ATM withdrawal, ESB Bank, New Brighton
7.   1:07 A.M. – Telephone call from defendant to Gregory Price
8.   3:15 A.M. – Text message from Patrick Brown to defendant stating "Phone was dead, what's up"
9.   8:08 A.M. – Telephone call from defendant to Gregory Price
10.  12:01:36 P.M. - $103.00 ATM withdrawal, Huntington Bank, Cranberry (defendant displayed alone in the victim's vehicle on video)
11.  12:02 P.M. - $103.00 ATM rejected withdrawal, Huntington Bank, Cranberry (defendant displayed alone in the victim's vehicle on video)
12.  3:24 P.M. - $103.00 ATM rejected withdrawal, Huntington Bank, New Brighton (defendant displayed on video)
13.  3:25 P.M. – ATM balance inquiry, Huntington Bank, New Brighton, showing a balance of $28,689.42 (defendant displayed on video)
14.  6:33 P.M. - $75.00 ATM/Mac machine withdrawal, Beaver Falls
15.  6:51 P.M. – Purchase by defendant using victim's credit/debit card at Chippewa K-Mart in the amount of $83.59 (defendant displayed on video)
16.  7:06 P.M. – Purchase by defendant using victim's credit/debit card at Chippewa K-Mart in the amount of $79.48 (defendant displayed on video)
17.  7:09 P.M. – Purchase by defendant using victim's credit/debit card at Chippewa K-Mart in the amount of $105.77 (defendant displayed on video)
18.  7:24 P.M. – Text message from Patrick Brown to defendant stating "Phone was dead, what's up"
19.  11:47 P.M. - $303.00 ATM rejected withdrawal, Beaver Falls (defendant displayed on video with victim's vehicle in background)

**May 13, 2009:**

1.   12:01 A.M. - $303.00 ATM withdrawal, Beaver Falls
2.   12:02 A.M. - $203.00 ATM withdrawal, Beaver Falls
3.   12:02 A.M. – Six unanswered telephone calls from Robert Campbell to defendant
4.   12:12 A.M. – Telephone call from defendant to Laura Rankin
5.   3:06:17 A.M. - $22.59 transaction at Sheetz, Beaver Falls
6.   4:11 A.M. – $101.50 Mac machine transaction, Beaver Falls
7.   4:14 A.M. - $5.69 Mac machine transaction, Beaver Falls (defendant displayed on video)
8.   5:03 A.M. – Text message from defendant to Patrick Brown stating "Need 150" (meaning defendant needed $150.00 worth of crack cocaine)
9.   6:10 A.M. - $6.33 transaction at East Rochester GetGo
10.  6:18 A.M. – Telephone call from defendant to Patrick Brown
11.  11:42 A.M. – Text message from Patrick Brown to defendant stating "Still need it?"
12.  1:06 P.M. – Telephone call from Kelly Carter to defendant
13.  1:30 P.M. – Defendant attempts to cash victim's check at ESB Bank, Beaver Falls
14.  1:36 P.M. – Telephone call from Kelly Carter to defendant
15.  1:50 P.M. - $200.00 ATM rejected withdrawal, ESB Bank, New Brighton

15

16.     1:51 P.M. – Balance inquiry, ESB Bank, New Brighton, showing balance of $27,872.06

17.     2:31 P.M. – Purchase by defendant using victim's credit/debit card at the Shoe Department, Beaver Valley Mall, in the amount of $69.99.

In addition, Detective Chamberlain obtained documentation from Verizon Wireless depicting the sites of cellular telephone towers in Beaver County from which he was able to confirm the approximate location of the defendant when he was using his cellular telephone. This information, together with the known observations of the defendant from witnesses and video displays of the defendant at bank ATM and retail locations, placed the defendant in the area of the victim's residence during the hours when she would have been killed and at the various locations at which he made ATM withdrawals and purchases using the victim's credit/debit card.

An examination of the defendant's blue jeans and tennis shoes under a blue light revealed possible blood stains. Samples of the blood of the victim and the defendant, together with the defendant's blue jeans, were delivered to the Pennsylvania State Police Crime Laboratory for analysis. Jennifer Badger, a forensic scientist in the serology section, determined that two stains on the outside seam of the lower leg of the defendant's blue jeans consisted of blood. She further detected the presence of blood on the eyelet of the toe of the defendant's left athletic shoe, but the sample was insufficient for a confirmatory testing for blood. In addition, examination of the handle of a steak knife found in the kitchen sink of the victim's residence submitted to the crime laboratory disclosed evidence of blood. Ms. Badger prepared samples of dried blood of the victim and the defendant and swabs of the blood on the defendant's jeans, tennis shoes and the steak knife for submission to the DNA section of the crime laboratory. Michael Biondi, a forensic scientist supervisor in the DNA section, conducted DNA testing on the swabs of the defendant's blue

16

jeans and determined that the blood on the jeans matched the victim's blood. The DNA profiles of the victim and the defendant could not be excluded as potential contributors of the blood stain from the defendant's shoe. The DNA profile of the victim was excluded as a contributor as to the knife found in the kitchen sink, while the DNA profile of the defendant could not be excluded as a contributor for the blood on the knife, because there also appeared DNA types from two unidentified individuals.

Dr. James Smith, a forensic pathologist, determined that due to observing the greenish discoloration of the body, signifying the first sign of decomposition, the victim's death occurred within an 18-hour to 36-hour period between 3:00 A.M. and 9:00 P.M. on May 12, 2009. Dr. Smith opined that the cause of death was the stab wounds to the neck which incised the right carotid artery and the right jugular vein. He noted a total of 46 knife wounds, 34 of which were located in the left neck region. Dr. Smith further described defensive wounds on the victim's hands and fingers indicating that the victim attempted to ward off her attacker. He testified that the concentration of the wounds in the neck area was an indication the victim was held down and was struck with such force as to penetrate from the left through the right side of the neck. Dr. Smith estimated that the blade of the knife was approximately one-half inch in width and three inches in length. The manner of death was homicide.

James Sarver met the defendant on May 15, 2009, while both were inmates in the Beaver County Jail. Mr. Sarver also was familiar with Mr. Campbell from whom he had purchased marijuana in the past. Mr. Sarver related that the defendant admitted to him that he had killed Ms. Grosskopf and intended to attempt to place blame on Mr. Campbell for the crime. In a second conversation with Mr. Sarver, the defendant queried as to why

17

Mr. Campbell came to the victim's residence and removed the sheets on the bed revealing the pool of blood. The defendant informed Mr. Sarver of the limit of $500.00 on the victim's credit/debit card and confirmed that he went partying and shopping after the killing. Mr. Sarver testified that he had previously been a visitor at the victim's residence, limited only to the main floor of the house.

Zack Valentine was the defendant's cellmate at the Beaver County Jail for approximately two weeks. On May 18, 2009, Mr. Valentine provided a statement to police in which he indicated that he had become acquainted with the defendant prior to their incarceration while working at Crow's Run Recycling. Mr. Valentine stated that the defendant acknowledged that he had killed the victim, wrapped her in a blue blanket and placed her body in the stairway to the attic between the two bedrooms in the victim's residence. The defendant also outlined the layout of the house and provided a diagram detailing the location of the bedrooms and the doorways from each bedroom to the attic. The defendant further described the placement of a tan blanket covering the blood on the bed and complained that Mr. Campbell had pulled the blanket away exposing the blood. Mr. Valentine, who had never been to the residence, drew a diagram of the residence for the police based upon the defendant's description. Mr. Valentine had been unaware of the homicide until his conversation with the defendant.

The defense presented evidence in an effort to place culpability for the crime on Mr. Campbell by attempting to demonstrate that he had been physically abusive toward the victim and that he had a financial motive for killing her.

Mr. Campbell testified that the victim called him shortly after he had moved out of the house and into Ms. Babich's residence, indicating that she desired to title the home in

18

both of their names. Ms. Babich, who was a mortgage processor and notary public, facilitated the transfer by having the deed prepared, notarizing Ms. Grosskopf's signature, recording the deed and paying the recording fee and transfer taxes, for which she was subsequently reimbursed.

Patricia Celeste, the next door neighbor and friend of the victim, observed a black eye on the victim on one occasion and her leg to be injured at a subsequent meeting, both injuries which the victim attributed to the defendant. When Ms. Celeste confronted the defendant regarding the incidents, he apologized for his actions. He further explained that the black eye occurred when he became angry with the victim for refusing to eat dinner he had prepared and he had struck the victim with the food plate. The leg injury resulted from Mr. Campbell accidently pulling a loose kitchen cabinet from its hinges causing it to strike the victim.

Stacie Delp, Kristine Ramer and Nancy Pranskey, all co-workers of the victim, noted black eyes on the victim, with Ms. Delp also observing the injured leg. Only Ms. Pranskey testified that the victim told her that the injuries were inflicted by Mr. Campbell.

On the evening of May 9, 2009, while Mr. Campbell, his wife and his friend, Martin Costanza, were patrons at Harvey Run Inn, a local tavern, Crystal Barnes, an employee, overheard Mr. Campbell, following a telephone conversation, say loudly to his wife, "cha-ching, cha-ching". Ms. Barnes admitted to being unaware of the meaning of Mr. Campbell's remarks.

Approximately two to three months following the victim's death, Mr. Campbell was advised by correspondence from Wal-Mart, the victim's employer, that he was the beneficiary of the victim's retirement account in the amount of $1,893.34 and life insurance

19

benefits in the amount of $22,000.00. The victim had designated Mr. Campbell the beneficiary as her common-law husband on June 27, 2005, approximately four years prior to her death. Mr. Campbell denied any knowledge that he was the victim's beneficiary prior to receiving notice from her employer. He, in fact, received the proceeds from both the retirement account and the life insurance as a result of Ms. Grosskopf's death.

Mr. Campbell also was the surviving joint tenant of the residence, and thus became sole owner following the victim's death. Testimony indicated that the balance of the mortgage was approximately $30,000.00 with the value of the home estimated at $10,000.00 due to its deteriorated condition.

In rebuttal, the Commonwealth introduced the medical records of the victim from Heritage Valley-Beaver Hospital for the period from 2004 through 2008, which revealed that she was treated on several occasions as a result of injuries sustained by falling.

As noted above, the defendant does not dispute that Ms. Grosskopf was murdered; however, he alleges that the Commonwealth failed to sustain its burden of proving that he committed the crime. The thrust of the defense was that Mr. Campbell had the motive and opportunity to kill the victim, since he would benefit financially by her death, and that he had physically abused the victim in the past.

### B. Facts and Evidence Adduced at the PCRA Hearing Held On August 4, 6 and 8, 2014

#### 1. Thomas Kurt Fuchel

As noted earlier, the Court conducted a hearing on defendant's Post Conviction Relief Act (hereinafter PCRA) Petition on August 4, 6 and 8, 2014. The Court heard testimony during parts of each of those three days. Since defendant had the burden of

20

proof, the defendant first called witnesses. Defendant first called Thomas Kurt Fuchel, Sr., Esquire, who was lead defense counsel at the trial. He was assisted by a new public defender at that time named Rebecca Fields, who was not called to testify by either party at the PCRA hearing. Fuchel first testified that it was protocol or procedure, at the time of the Dennerlein trial, for an Assistant Public Defender to begin representation in a case at the preliminary hearing stage and continue with the case through trial. Fuchel did that in this case.

Fuchel testified that he handled the preliminary hearing. He testified that it was his practice to speak with the client prior to the preliminary hearing in the lock-up facility. He did not recall whether he met with the defendant before the preliminary hearing in this case, but indicated that was his standard practice. Fuchel could not provide any specific information as to when he met with the defendant. He did admit that it was significant to meet with the client early in the case to discuss strategy and to discuss what the defendant did or did not do or know in connection with the charges.

Fuchel indicated that the Commonwealth provided extensive discovery. According to Fuchel, defendant Dennerlein complained about not receiving discovery, and Fuchel claims that this prompted him to make sure the defendant received the discovery. Fuchel stated that he believed it was his decision regarding what portions of the discovery or other information to use in this case. Fuchel claimed that he had discussions with Dennerlein, both before and during trial, regarding what information to use. He conceded that use of prior criminal convictions under Pa.R.Evid. §609 is a significant tool to impeach witnesses for the opposing side.

21

The first issue raised by defendant is the failure to use prior convictions and other information for purposes of impeaching key Commonwealth witnesses. Counsel for Dennerlein at the PCRA hearing initially questioned Fuchel about a Commonwealth witness by the name of Laura Rankin. Rankin had, and testified to, information regarding defendant using the victim's credit/debit to make bank withdrawals. Fuchel testified that it was his theory that Robert Campbell, who was a former boyfriend of the victim, committed the murder. Fuchel continued by stating that he believed that Rankin was actually a helpful witness to the defense because she also had information that the defendant used the victim's credit/debit card not only at and shortly after the time of the murder, but also prior to that time. Rankin also testified that defendant had the PIN for the credit card further confirming, according to Fuchel, that her testimony would actually indicate that defendant did not just use the credit card after the murder, but also before the murder showing his consented-to access to the card. Fuchel thought this was beneficial testimony and pointed to Volume IV of the trial transcript, page 30, line 25, through page 341, lines 1-3. Defense counsel at the PCRA hearing pointed out and entered exhibits to confirm that Rankin had convictions for retail theft, trademark counterfeiting and theft by unlawful taking, all of which were crimes of *crimen falsi*. The Commonwealth confirmed, on cross-examination, that Fuchel did not want to impeach Rankin because she was actually favorable to defendant's position in this case. However, defense counsel noted for the Court that at Volume IV, page 341 of the trial transcript, Fuchel cross-examined Rankin about using crack cocaine in the presence of her child, which was a form of impeachment, but yet chose not to impeach her credibility with crimes of *crimen falsi*.

22

The second Commonwealth witness who had prior criminal convictions was Zachary Valentine. Valentine was defendant's cell mate at the Beaver County Jail, and Valentine testified at trial regarding defendant's admissions about his (defendant's) involvement in the killing.

Fuchel testified that he discussed Valentine with Dennerlein, and according to Fuchel, defendant Dennerlein confirmed that some of the statements that Valentine made in a report of interview were true. Fuchel claims that he continuously cautioned Dennerlein not to have conversations with Valentine. Dennerlein never admitted his guilt to Fuchel, but, according to Fuchel, the defendant did confirm some of the things that Valentine said.

Interestingly and bewildering to the Court was Fuchel's concern about perjury if defendant testified at trial because defendant allegedly said he was going to lie at trial regarding the statements that Valentine made. This had very little, if anything, to do with regard to why Fuchel did not cross-examine Valentine. When pressed by defense counsel at the PCRA hearing, Fuchel confirmed that he must impeach this type of witness. Valentine had a conviction for theft by deception, and another conviction in Fayette County. Fuchel confirmed that he did not question Valentine about these matters, and Fuchel indicated that it was inadvertent not to use them, that they must have slipped through the cracks and that his decision not to use them was bad in hindsight.

A third Commonwealth witness who testified against defendant was James Sarver. Sarver was another jailhouse informant, who indicated that defendant admitted to the killing. Sarver also had a conviction for terroristic threats. Although not a *crimen falsi* crime, Sarver was on probation, and Fuchel could have questioned Sarver on whether he expected any favorable treatment on a probation violation, which was never done. Fuchel

23

did question Sarver about a simple assault charge that was dismissed, at Volume V, page 153, of the trial transcript. Fuchel conceded that, in hindsight, he should have used the terroristic threats probationary situation for cross-examination purposes at trial. Fuchel could not explain his failure to use this information.

A fourth Commonwealth witness who testified was Kelly Carter. Kelly Carter came to the residence after the crime and was present when Robert Campbell, the person who Fuchel intended to pin blame on, saw blood on a dog at the residence and pointed this out to Kelly Carter. Carter had a conviction for receiving stolen property, which Fuchel did not use to cross-examine her. Fuchel indicated that he would normally impeach this type of witness, but did not do so in this case because he believed that Carter's testimony was favorable to the defense in that it tended to implicate Campbell.

The fifth Commonwealth witness was Brian Silberger. At trial, Silberger testified that defendant Dennerlein purchased several thousand dollars of crack cocaine from him (Silberger) at or around the time of the murder. Silberger further testified that when he (Silberger) questioned Dennerlein concerning the whereabouts of the victim, Dennerlein told him (Silberger) that the victim was in Maryland visiting her brother. (Trial Transcript, Vol. IV, p. 247). Silberger had a conviction for burglary and a second conviction for theft by unlawful taking. Both of these crimes were of a *crimen falsi* nature and Fuchel could not recall why he did not use them for cross-examination purposes.

The sixth Commonwealth witness was Patrick Brown. Brown was the second witness to testify regarding defendant's drug purchases or attempts to purchase drugs at or around the time of the homicide. (Trial Transcript, Vol. IV, p. 274). Brown conceded that he was informed by the Commonwealth that he would not be charged for providing drugs to

24

the defendant. Fuchel questioned Brown regarding the fact that he would not be charged, going to Brown's bias or motive to testify, but neglected to question him about two pending cases and the potential for favorable treatment or leniency in those cases based on this testimony. Fuchel confirmed that it would make sense to question the witness on these issues, but added that he was not sure he knew about these charges. Fuchel conceded that the use of such impeachment material could increase the chance of acquittal.

The second issue raised by defendant in his PCRA petition was testimony that revealed defendant's incarceration at the time of trial. Fuchel confirmed that a defense lawyer usually attempts to preclude reference to the client being in jail. Fuchel noted, however, that it was extremely difficult in this case because of others who testified regarding admissions made by the defendant and who were in jail with him. Fuchel stated that he did discuss this issue with the defendant and confirmed that the reference to being in jail was an important issue.

Fuchel was pressed by present defense counsel, and indicated that he thinks he discussed this issue in detail with the defendant, but was not sure. It was at this point that Fuchel added that he had problems communicating with the defendant during trial and that most of the problems for this lack of communication lie with the client (defendant). According to Fuchel, he gave discovery to the defendant twice. He said he mailed the discovery the first time, and defendant said he did not receive it. This, according to Fuchel, prompted him to go to the jail personally and deliver the discovery in the presence of the Assistant Warden. Fuchel said there were two occasions at the jail when he had problems with defendant Dennerlein.

25

Fuchel testified that, at one of these two instances, the defendant became very physical and threw the public defender's paralegal, Dionna Steele, to the ground and went after Fuchel. Fuchel stated that Dennerlein became verbally abusive on a second occasion. He indicated that Dennerlein caused these disruptions.

As to the issue of defendant being in jail, Fuchel added that it was trial strategy for this information to come into evidence because Fuchel thought it would be helpful for the jury to know that the individuals who were testifying were also in jail.

The Commonwealth brought out the fact that they objected when Fuchel went down this road, and Fuchel asked for a sidebar with the Court at trial and confirmed that he wanted this information before the jury. The Commonwealth stipulated that the information came before the jury at the request of defendant with no objection or curative instruction requested.

Fuchel was also questioned regarding the third issue raised by the defendant, namely, whether Zachary Valentine was acting as an agent of the government when he was debriefed by the Commonwealth and then placed back in the same cell with the defendant. Present defense counsel asserts that this gives rise to the basis for a motion to suppress the statements made to Valentine on the basis that Valentine may have been acting as an agent for the Commonwealth in securing admissions without Miranda warnings. Fuchel said he did not know that Valentine was questioned and placed back in the same cell and never considered this issue or argument.

The fourth issue was general failure to cross-examine witnesses. For example, present defense counsel brought to Fuchel's attention that the Commonwealth only placed into evidence bank records of the victim at or near the time of the homicide to establish

26

that defendant was using the credit/debit card at that time and thereby establish a motive for the killing. Present defense counsel pointed out that Fuchel neglected to use prior bank records to indicate that defendant had used the credit/debit card well in advance of the homicide.

2.      **Benjamin James Dennerlein**

The defendant, Benjamin James Dennerlein, also testified at the PCRA hearing. Defendant Dennerlein was present throughout the hearing.

Dennerlein testified that Fuchel, with the assistance of another Assistant Public Defender, Beth Manifesto, handled his preliminary hearing on August 1, 2009. Dennerlein testified that he never met with Fuchel prior to the preliminary hearing and that Fuchel never came to the jail to see him and never spoke with him in the lock-up prior to the preliminary hearing. The first time that defendant Dennerlein actually met with, and saw, Fuchel was in the courtroom when the preliminary hearing occurred.

The next step in the process was the arraignment in October of 2009. Defendant was incarcerated between the time of the preliminary hearing and the arraignment, and testified that he had no contact with Fuchel between the time of the preliminary hearing and the arraignment.

Dennerlein stated that a private investigator for the public defender's office did come to the jail in early 2010 to gather information and that Fuchel came to the jail later in January of 2010 and several times between January of 2010 and the time of trial in July of 2010.

Dennerlein confirmed that paralegal Dionna Steele came to the jail several times to meet with him, and on one occasion Fuchel was also present. As to the incident in which

27

Fuchel claimed that Dennerlein became verbally abusive and physical, the defendant testified that Fuchel actually got in his face and that he (defendant) did not get physical with Fuchel. Dennerlein stated that the incident got very loud and that a jail guard came into the room because of the noise. According to Dennerlein, Dionna Steele advised the guard that the defendant did nothing wrong.

Dennerlein went on to state that, after his conviction in this case, he had to file his own appeal because Fuchel neglected to timely file the appeal. No post-sentence motion was filed. Fuchel requested several extensions to file a brief for the appeal, and the appeal was eventually remanded to the trial court by the Superior Court because of this. Present defense counsel was appointed and handled the appeal.

Defendant testified that throughout the trial, and early appeal proceedings, defendant's mother was providing letters to Fuchel, which Fuchel failed to respond to. Defendant filed his own PCRA petition in September of 2013 and present defense counsel filed a supplement in April, 2014.

The defendant did address specific comments and allegations raised by Fuchel. As to the testimony of Zachary Valentine, defendant advised that Fuchel told him that Valentine was going to testify that defendant confessed to Valentine and that this testimony may hurt at trial. Defendant testified that he never said he would perjure himself. According to defendant, he (defendant) requested that Fuchel cross-examine Valentine with impeachment material, and Fuchel responded that he did not want to complicate the case. Defendant was adamant about the fact that he pressed Fuchel to impeach Valentine.

As to Laura Rankin, defendant claims that he actually brought some of the *crimen falsi* convictions to Fuchel's attention. Defendant testified that Fuchel never advised him

28

(defendant) that he wouldn't use the information against Rankin because she was favorable. Instead, defendant testified that Fuchel did not even know about Rankin's prior convictions until defendant brought them to his attention.

With regard to all of the Commonwealth witnesses who had prior convictions, defendant testified that he was not aware that a corrupt and polluted source charge was in order and that Fuchel never requested one. It was only after present defense counsel brought this to defendant's attention that he was aware of this.

As to the issue of defendant's incarceration being brought up at trial, defendant stated that Fuchel told him during trial that a deputy sheriff would mention that the defendant was in jail after a sidebar with the Court, but also stated that Robert Campbell had already testified to it and therefore it would come in. According to defendant, Fuchel never discussed this issue with him in advance or whether it was part of the trial strategy. Defendant claimed that he knew it was not right for this information to come in because the sheriff went to great lengths to keep the jury from seeing defendant being escorted to the courtroom by deputy sheriffs in handcuffs and shackles during breaks in the trial.

Defendant testified that when it was time for the defense case to begin, defense counsel called multiple witnesses in a brief period and then turned to him (defendant) and said "you're next, but I suggest you not testify." Defendant contends that this is the only time Fuchel discussed with him whether or not to testify.

With regard to the third issue, namely, Zachary Valentine potentially being an agent of the government, Dennerlein testified Fuchel never discussed this issue with him. It came to light that Valentine had testified for the Commonwealth in other cases and that neither defendant nor Fuchel knew this.

29

Dennerlein testified that he wrote a letter to the Trial Judge (Dohanich) regarding failure to receive discovery. Dennerlein claims that Fuchel came to the jail angry after receiving notice that Dennerlein wrote a letter to the Judge. Defendant claims that Fuchel came into the cell, crumbled the letter, told him (defendant) never to write a letter to the Judge again, told defendant that he (Fuchel) was going to trial with what information he had, and told defendant that he (defendant) was going to burn. After this discourse, Fuchel left the cell according to the defendant.

With regard to the bank records, defendant was aware that the Commonwealth wanted to focus on bank records for five days after the homicide. Defendant knew that all of the bank records would show that he had made numerous withdrawals from the victim's account for a long period of time prior to the incident. Defendant claims that he kept encouraging Fuchel to get the bank records and video surveillance of the ATM machine, but Fuchel never looked into this matter, stating that it was too late.

### 3. Robert Chamberlain

The defendant also called Beaver County Detective Robert Chamberlain as a witness at the PCRA hearing. Chamberlain was a co-affiant on the criminal charges filed against Dennerlein. The Detectives' Bureau is part of the Beaver County District Attorney's Office. Detective Chamberlain was questioned about the involvement of Zachary Valentine in this case and his use as a witness by the Commonwealth. Chamberlain testified that he did not know Zachary Valentine prior to the Dennerlein case. Chamberlain testified that he met with Zachary Valentine twice during this case.

According to Chamberlain, Valentine first came to the attention of the Commonwealth when Valentine's wife called the District Attorney's Office and advised that

30

a representative of the District Attorney should speak to Valentine regarding the Dennerlein case. This caused the District Attorney's Office to request transport of Valentine from the Beaver County Jail to the Beaver County Courthouse for questioning on May 18, 2009, prior to the trial in this case. Chamberlain advised that he secured all of Valentine's knowledge and information in the interview of May 18, 2009 and had no intention of speaking with him again short of requesting his testimony at the trial. Chamberlain did indicate that there eventually arose the need for a second meeting for the purpose of having Valentine draw a diagram of the crime scene. Chamberlain indicated that he did not know that Valentine had served as a witness for the Commonwealth in prior cases at the time he interviewed Valentine in 2009. Chamberlain learned this later through discussion with another Beaver County Detective, Kim Clements. According to Chamberlain, Valentine expressed fear of being in the same cell with the defendant, and Chamberlain testified that he never told Valentine to keep his eyes and ears open about the case or to solicit any further information from Dennerlein after the initial interview on May 18, 2009.

On cross-examination, Chamberlain testified that he was able to corroborate Valentine's information given during the interview. In fact, Chamberlain stated that he left the interview room on several occasions during the interview to check Valentine's statement and was able to confirm what he was saying based upon review of phone records and photos of the crime scene. Chamberlain was the final witness called by the defense.

### 4.    Kim Clements

The prosecution commenced its case on Friday, August 8, 2014. They first called Detective Kim Clements. Clements testified regarding Zachary Valentine. She stated that she knew Valentine as a result of his prior testimony for the Commonwealth in another

31

homicide case. She did participate in the Valentine interview on May 18, 2009. Clements testified that she played no part in arranging for Valentine to be interviewed or in his involvement in this case. She confirmed that it was Valentine's wife who brought him to the attention of the prosecution. Clements also confirmed that neither she nor anyone else from the prosecution gave Valentine any instructions to pursue further information from the defendant or to act as an agent for the Commonwealth.

On cross-examination, Clements admitted that she believed Valentine may come back with some additional information after the first interview, but she never instructed him to do so. Clements confirmed that there was a second interview of Valentine and also stated that she was involved in his preparation for testimony at trial.

### 5. Eugene St. Clair

The next Commonwealth witness was Chief Eugene St. Clair of the Freedom Police Department. St. Clair is now the chief, but was a sergeant at the time of the Valentine interview. St. Clair was the co-affiant on the criminal charges with Detective Chamberlain. St. Clair indicated that he could not recall all of the details of the interview without referring to his report and was permitted to do so. St. Clair did recall that Valentine gave specific information regarding Dennerlein's statement that coincided with evidence found at the crime scene. St. Clair also confirmed that he gave no instructions to Valentine to solicit any additional information from Dennerlein. The one thing that St. Clair testified to that was inconsistent with Chamberlain and Clements was that St. Clair's report raises the inference that there were a number of interviews with Valentine. There are no other specifics on dates of interviews. Also, there was additional information in St. Clair's report that was not in the Chamberlain report, but no major inconsistencies. St. Clair did not know

32

Valentine prior to the interview in question. St. Clair indicated that he only interviewed Valentine in the presence of Beaver County detectives, but did recall that he was involved in interviews on more than one occasion.

### 6. Dionna Steele

The final witness called by the Commonwealth was Dionna Steele, a paralegal in the Beaver County Public Defender's Office. This testimony was the most troubling for the Court with regard to the PCRA hearing. Reference to Attorney Fuchel's testimony above reflects that he testified to an incident at the Beaver County Jail in which Fuchel claimed that Dennerlein became hostile in an attorney interview room with Dionna Steele present. Fuchel testified that Dennerlein pushed Ms. Steele to the ground and came after Fuchel. Ms. Steele gave quite a different version of that event. She recalled that she took an envelope to the jail from Attorney Fuchel to deliver to Dennerlein. She indicated that she had met with Dennerlein on a number of occasions at the jail and never had a problem with him. On the particular occasion when she took the envelope to the jail for Attorney Fuchel, she was in the attorney meeting room with Dennerlein when Fuchel entered the room. She testified that Fuchel began yelling at the defendant and the defendant began to yell back. She became frightened and stepped back.. She actually pushed the emergency button in the room because of the situation. She stated that Fuchel began to back up and actually backed into her. Dennerlein thought she may fall and grabbed her arm to prevent her from falling. Other than this, Steele testified that Dennerlein never touched her. A jail guard came into the room, and Steele told the guard that the defendant did not do anything wrong.

On both direct and cross-examination, Steele testified that it was Attorney Fuchel who got into the defendant's face. She specifically testified that the situation was escalated

33

by Attorney Fuchel pounding on the table. She was startled by Attorney Fuchel's actions and specifically recalled that he walked toward Dennerlein and got into his (Fuchel's) face. She said that Fuchel was within inches of Dennerlein's face. She stated that Fuchel was very angry and was clearly the aggressor in this situation. According to Steele's testimony, the relationship between the two was hostile from that point forward.

Defense counsel pressed Steele on cross-examination and was successful in getting Steele to say that Dennerlein never gave her a problem throughout the time that she met with him prior to trial. In fact, she stated that defendant Dennerlein was always respectful. She stated that Dennerlein was very frustrated in her discussions with him about discovery and the fact that he (Dennerlein) was not receiving anything from Fuchel. Steele stated that she told the jail guard that the defendant did nothing wrong in the attorney meeting room because she believed that and did not want to see Dennerlein receive sanctions at the jail.

The Court questioned Steele in an attempt to compare her testimony with that of Fuchel, and she specifically undercut Fuchel's version of the events. This came from a prosecution witness, who actually worked in the same office as Defense Trial Counsel (Fuchel) at the time of the incident.

## ANALYSIS

### A.    Claims Made by the Defendant

The defendant's PCRA petition has raised four claims here. Those claims are as follows:

1.    That defense counsel failed to cross-examine witnesses on the basis of bias and prior criminal records of *crimen falsi* or otherwise;

2.    That there was prejudicial error to the defendant in that there was a reference to defendant's incarceration during the

34

trial of this case placed into evidence by both defense counsel and the Commonwealth;

3.  That defense counsel failed to file a motion to suppress due to alleged interrogation of Zachary Valentine, who was asserted to be a government agent; and

4.  That defendant was denied the right to confrontation under the Pennsylvania and United States Constitutions on the basis of defense counsel's ineffective cross-examination.

These are the contentions that testimony and evidence was received on and are the issues that will be addressed by the Court in the following subsections. [1]

## B.  Applicable Law

Defendant contends that his trial counsel rendered ineffective assistance and that he is therefore entitled to either a new trial or dismissal of the charges against him. (See p. 2, ¶13 of defendant's Amended Petition for Post-Conviction Collateral Relief).

"It is well-established that counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him." *Commonwealth v. Koehler*, 36 A.3d 121, 132 (Pa. 2012) (citing *Strickland v. Washington*, 466 U.S. 668, 687-91, 104 S.Ct. 2052, _____, 80 L.Ed.2d 674, _____ (1984). The Pennsylvania Supreme Court set forth a three-part test to determine whether a defendant has received ineffective assistance of counsel, with those three parts being as follows: (1) the underlying legal issue has arguable

---

[1] Defendant raised other issues in his original Petition, but these four issues are the only real issues pursued at the hearing other than some questions regarding the direct appeal, which are discussed *infra*.

35

merit; (2) counsel's actions lacked an objective reasonable basis; and (3) the defendant was prejudiced by counsel's act or omission. *Koehler*, 36 A.3d at 132 (citing *Commonwealth v. Pierce*, 515 Pa. 153, _____, 527 A.2d 973, 975 (1987). The Court must analyze defendant's four claims under these parameters.

        **C.**     **Defendant's Claims 3 (That defense counsel failed to file a motion to suppress due to alleged interrogation of Zachary Valentine, who was asserted to be a government agent) and 4 (A denial of the right to confrontation under the Pennsylvania and United States Constitutions on the basis of defense counsel's ineffective cross-examination) Lack Merit**

Defendant's third claim asserts that counsel was ineffective for failure to file a motion to suppress due to defendant's alleged interrogation, without *Miranda* warnings, by a government agent. Specifically, he asserts that his Fifth, Sixth and Fourteenth Amendment rights under the United States Constitution were violated because Zachary Valentine was acting as an agent for the Commonwealth at the time that he had discussions with the defendant about, and the defendant admitted to, the killing of the victim in this case. Defendant goes on to contend that Valentine was transported to speak with the County Detectives at the Beaver County Courthouse in May of 2009, and was thereafter sent back to the jail, allegedly to further question the defendant and obtain admissions from him without any *Miranda* warnings.

This claim was not established by the evidence adduced at the PCRA hearing. In fact, to the contrary, the evidence established that Valentine was only questioned on one occasion by the detectives, and the uncontradicted testimony further established that Valentine was <u>not</u> given any instructions to interrogate the defendant or to obtain any

36

further admissions from him by the County detectives or police officers who interviewed him. Without evidence to support this claim, it must be denied for lack of arguable merit.

Also, defendant's fourth claim, namely that he was denied the right of effective cross-examination of those witnesses testifying against him because of the lack of cross-examination by defense counsel, must be denied for lack of merit. The major issue raised by defense counsel at the hearing in August, 2014 was that trial defense counsel failed to use prior bank statements to cross-examine witnesses and establish that defendant had used the victim's credit/debit card not only at our around the time of the homicide, but also in advance of the same, thereby showing that defendant had consented-to access to the card. The evidence of record establishes, through the testimony of Laura Rankin, that the defendant was accorded the ability to place this matter before the jury by Rankin's testimony that the defendant not only had access to the card, but also the PIN as stated in the Facts section above (Trial Tr., Vol. IV, pp. 340-41). This issue, in the estimation of the Court, does not arise to a meritorious claim based upon the evidence in the trial transcript and the evidence adduced at the PCRA hearing.

> D. Defendant's Second Claim (Alleged Improper Reference
> At Trial to Incarceration of Defendant) Must be Denied
> Because Defense Counsel had a Reasonable Strategic
> Basis for His Action in Admitting the Evidence, and the
> Claim Also Lacks Merit

Defendant claims that he was prejudiced in this case by not only the admission of evidence by the Commonwealth that he was incarcerated prior to and during the trial, but also the fact that defendant's own counsel elicited this testimony through cross-examination of a Commonwealth witness. In essence, defendant claims that not only was the evidence brought

37

before the jury by testimony, but also that defense counsel did not request a curative instruction with regard to the testimony.

The trial transcript and the testimony of Attorney Fuchel at the PCRA hearing established that defense counsel asked Commonwealth witness Robert Campbell where he met the defendant, and the response was that Campbell met the defendant while both were in jail. At the PCRA hearing, as noted in the Facts section above, Fuchel testified that it was his trial strategy for this information to come into evidence because he thought it would be helpful for the jury to know that Campbell, who was the individual that defense counsel hoped to pin blame on, had been in jail in the past and, therefore, had a questionable background himself. The Commonwealth stipulated, at the PCRA hearing, that this information came before the jury at the request of the defendant with no objection or curative instruction requested. To the Court's information and understanding, there was no reference as to why the defendant was in jail before or during the trial. The only reference was to the fact that defendant was in jail.

"Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interest." *Commonwealth v. Howard*, 553 Pa. 266, _____, 719 A.2d 233, 237 (1998). The *Howard* Court also noted that a claim for ineffective assistance of counsel cannot succeed by simply comparing, by hindsight, the trial strategy employed with alternatives not pursued. "A finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Id.*

In this case, the trial testimony not only included the references noted with regard to the *Campbell* testimony noted above, but also included the testimony of Zachary Valentine, who was

38

defendant's cell mate when admissions regarding the homicide and defendant's involvement in the same were made.. Valentine's testimony clearly reflected that the admissions were made while he and the defendant were incarcerated together. (Trial Tr. Vol. V, pp.160-16). This reference was unavoidable in order to set the stage in which the admissions occurred. Again, there was no reference to why the defendant was in jail.

Defense counsel made it clear that his strategy was to attempt to paint a sordid picture of Commonwealth witnesses, such as Campbell and Valentine, by not only permitting references to their past as prisoners when questioned by the Commonwealth, but also by bringing it out himself when he questioned the witnesses. This trial strategy cannot be said to be unreasonable under the circumstances.

Furthermore, the Pennsylvania Supreme Court decision in *Commonwealth v. Johnson*, 838 A.2d 663 (Pa. 2003) is instructive and warrants a determination that this claim lacks merit. In *Johnson*, the Pennsylvania Supreme Court specifically stated that "although generally no reference may be made at trial in a criminal case to a defendant's arrest or incarceration for a previous crime . . . there is no rule in Pennsylvania which prohibits reference to a defendant's incarceration awaiting trial or arrest for the crimes charged." *Id.* at 680 (citation omitted). In *Johnson*, the Supreme Court also cited *Commonwealth v. Wilson*, 538 Pa. 485, 506-07, 649 A.2d 435, 445-46 (1994) for the proposition that testimony indicating that the defendant was incarcerated prior to trial was not improper where the jury could reasonably infer that the defendant's incarceration was the result of the criminal acts for which the defendant was on trial. In this case, although there was reference to the fact that defendant was in jail prior to trial, there was no reference as to why he was in jail, which would give rise to the inference that the

39

defendant was detained as a result of the case for which he was on trial and, therefore, proper under *Johnson* and *Wilson*.

For these reasons, defendant's second claim must be denied.

E.     **Defendant's First Claim (That Defense Counsel Was Ineffective for Failing to Cross-Examine Commonwealth Witnesses for Bias and Prior Criminal Records, Especially Of *Crimen Falsi*) is Meritorious But Does Meet the <u>Prejudice Threshold to Overturn the Verdict</u>**

This issue was the most troubling to the Court in this case. It was abundantly clear from defense counsel's testimony that he either completely neglected to cross-examine key Commonwealth witnesses with regard to crimes of *crimen falsi* that could affect their credibility or that he simply did not take the time to discover that such information existed for cross-examination purposes. Counsel (Fuchel) used such terms in his testimony as the prior convictions for crimes of *crimen falsi* with regard to Zachery Valentine may have "slipped through the cracks"; that in hindsight, "he should have used" the convictions of *crimen falsi* to cross-examine James Sarver; that he could not recall why he did not cross-examine Brian Silberger with his convictions for crimes of *crimen falsi*; and, most importantly, his admission that the use of crimes of *crimen falsi* for cross-examination purposes could increase the chance of acquittal "in a prosecution of this type." Defense counsel's answers were inexplicable. He consistently could not explain, in a rational manner, why he did not question these witnesses with regard to these crimes or did not know about the crimes so that he could use them in cross-examination.

Moreover, the Court was troubled by the stark contrast of the versions of the events with regard to the meeting between Attorney Fuchel and defendant at the Beaver County Jail prior to trial referenced in the Facts section above. Fuchel contended that the defendant

40

became hostile, attacked him and knocked his paralegal to the ground. The defendant contested this and gave a different version of the events. The defendant testified that Fuchel was the instigator, that Fuchel got in his (defendant's) face and that he (defendant) was merely trying to assist the paralegal who was knocked backward. When the Commonwealth called the paralegal (Dionna Steele) to the stand during the PCRA hearing, the Court was expecting to hear her confirm Fuchel's version of the events. Instead, she confirmed, to the letter, the defendant's version of the events, specifically testifying that the defendant grabbed her arm to prevent her from falling while Fuchel was clearly the instigator. This paralegal described the relationship between Fuchel and the defendant from that point forward as hostile. It must also be remembered that the defendant had to file his own appeal after conviction, that attorney Fuchel missed filing deadlines with the Superior Court, that new counsel had to be appointed to handle the appeal and the PCRA because of Fuchel's negligence, and that the defendant actually filed his own PCRA petition. All of these factors lead the Court to the conclusion that the first two prongs of the PCRA burden of proof requirements are met by this claim, namely, first, that the underlying argument has merit, and second, that counsel (Fuchel) had no reasonable strategic basis for his action or inaction. This requires the Court to consider, for purposes of this claim, only the third requirement, namely, whether the petitioner suffered prejudice because of counsel's ineffectiveness.

The Pennsylvania Supreme Court, in *Commonwealth v. D'Amato*, 579 Pa. 490, _____, 856 A.2d 806, 812 n.5 (2004), stated as follows:

> The 'prejudice' prong, under the PCRA, is satisfied when the petitioner demonstrates that the alleged ineffectiveness so undermined the truth-determining process that no reliable

41

> adjudication of guilt or innocence could have taken place, see 42 Pa.C.S. §9543(a)(ii), in other words, that there is a reasonable probability that, but for counsel's act or omission, the outcome of the proceeding would have been different.

See also, *Commonwealth v. Miller*, 819 A.2d 504, 517 (Pa. 2012); *Commonwealth v. Tilley*, 566 Pa. 312, _____, 780 A.2d 649, 652 (2001); and *Commonwealth v. Kimball*, 555 Pa. 299, 312-13, 724 A.2d 326, 333 (1999). Thus, the Court must determine, under this standard, whether counsel's ineffectiveness so undermined the truth-determining process in this case that no reliable adjudication of guilt or innocence could have taken place.

While defendant's claim does have merit, it only relates to a portion of the Commonwealth's case against him. The failure to cross-examine these witnesses, with regard to prior convictions, relates only to admissions allegedly made by the defendant and his use of the victim's credit/debit card for purposes of furthering his drug habit.[2] If this was the extent of the evidence against defendant, this claim would surely be meritorious and result in a new trial. However, there was significant other evidence against the defendant that was not affected by this lack of cross-examination. .

For example, there was testimony regarding defendant's statement to Beaver County Detectives Patrick and Clements that is detailed at length at pages 11-13 of this Opinion. That testimony reflects that defendant attempted to explain away his involvement in this matter and provide quasi-alibi evidence to exonerate himself. The defendant specifically stated that he took the victim to work on the night of the incident and then went back to pick her up, but she was not at work. Video evidence from the victim's employer clearly showed that the victim never came to work on that date. Defendant also stated that he was watching a hockey game with his

---

[2] The Court also notes that even though these matters were not covered in cross-examination of the witnesses, other matters were covered, such as the incarcerated status of some of the witnesses and drug selling or dependency status of others that cast them in an unfavorable light in the jury's eyes and thereby called their credibility into question.

42

girlfriend at the victim's residence on the night in question. This portion of the statement was directly contradicted by the girlfriend who denied that she ever went to the victim's residence on that date.

Moreover, the Commonwealth presented records of ATM transactions and cellular telephone calls, in chronological order, that are detailed at pages 13 through 16 of this Opinion. As stated at page 16 of this Opinion, this information, together with the known observations of the defendant from witnesses and video displays of the defendant at bank, ATM and retail locations, placed the defendant in the area of the victim's residence during the hours when she would have been killed.

Most importantly, a DNA examination of blood found on the defendant's blue jeans matched the victim's blood. That same DNA analysis could not exclude the blood of the victim as a potential contributor to a blood stain found on the defendant's shoes and could not exclude the defendant as a potential contributor of blood found on a knife in the kitchen, which was apparently the murder weapon. Dr. James Smith, a forensic pathologist, testified that the victim died as a result of stab wounds to the neck.

This evidence, when coupled with an abundance of other circumstantial evidence recited in the Facts section of this Opinion between pages 2 and 20, clearly overcomes any claim of prejudice made by the defendant in this claim of his petition.[3] The Court, in its discretion, does

---

[3] The Court is cognizant of the fact that the record reflects that defendant filed his own appeal (Docket Entry No. 57); that after the appeal was filed, defense counsel (/Fuchel) failed to file a brief on defendant's behalf and was admonished by the Pennsylvania Superior Court for failure to file said brief in an Order of June 23, 2011 and given 30 additional days to file the brief, but still failed to file a brief (Docket Entry No. 77); and that failure to file an appeal or an appellate brief constitutes abandonment of counsel and, therefore, per se, ineffectiveness. *Commonwealth v. Britt*, 83 A.2d 198, 203 (Pa. Super. 2013), *citing Commonwealth v. Burkett*, 5 A.3d 1260, 1277 (Pa. Super. 2010). However, Fuchel was removed from the case and new counsel was appointed. This new counsel pursued the appeal with the Superior Court, filed a brief and requested allowance of appeal from the Pennsylvania Supreme Court, thereby alleviating the prejudice. Moreover, defendant alluded to the deficiencies on the last page (p. 44) of his original PCRA motion, but presented no evidence regarding this at the August, 2014 hearing other than to obtain an admission from Fuchel that he (Fuchel) failed to file the appellate brief.

43

not believe that the alleged ineffectiveness by this issue, alone, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place and, therefore, denies the petition on the basis of this claim.

## CONCLUSION

For the foregoing reasons, defendant's PCRA Petition will be denied. An appropriate Order will be entered.

BY THE COURT:

_James J. Ross_ J.

JUDY K. ENSLEN
CLERK OF COURTS

14 NOV 19 PM 1: 16

BEAVER COUNTY
PENNSYLVANIA

2014 NOV 18 P 2: 54

S. J. ROSS
JUDGE

BY THE COURT